THE CITY OF EVANSTON, Plaintiff-Appellee, *v.* CREATE, INC., Defendant-Appellant.

First District (2nd Division)    No. 79-1113

Opinion filed June 3, 1980.

Samuel W. Witwer, J. Alfred Moran, Samuel W. Witwer, Jr., and William F. Jensen, III, all of Witwer, Moran, Burlage & Atkinson, of Chicago, and Donald W. Kahn, of Skokie, for appellant.

Jack M. Siegal, Corporation Counsel, and James T. Murray, Special Corporation Counsel, of Evanston, for appellee.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, Create, Inc., a corporate real estate broker-lessor (hereinafter referred to as Create), appeals from an injunction issued by the circuit court of Cook County which enjoins Create "from prosecuting or in any way giving further effect to certain clauses contained in certain leases * * * found to be in violation of Chapter 23½ of the Code of the City of Evanston * * *." The sole issue presented for review is whether the City of Evanston may, consistent with its power as a home-rule unit, regulate various aspects of the residential landlord-tenant relationship.

For reasons hereinafter set forth, we affirm the judgment of the circuit court of Cook County.

On March 17, 1975, the City of Evanston (hereinafter referred to as the City) enacted chapter 23½ to the Code of the City of Evanston, 1957, as amended, entitled the "Residential Landlord and Tenant Ordinance" (hereinafter referred to as the Ordinance). The Ordinance was enacted pursuant to the City's power as a home-rule unit.[1] The purpose of the Ordinance is embodied in section 23½—1.102, which provides:

---

[1] That the City is a home rule unit is not debated. Section 6(a) of article VII of the Constitution of 1970 bestows home rule powers upon any municipality which has a population of more than 25,000. The City has a population in excess of 25,000.

"It is the purpose of this Ordinance and the policy of the City of Evanston, in order to protect and promote the public health, safety and welfare of the citizens in the City, to establish rights and obligations of the landlord and the tenant in the rental of dwelling units and to encourage the landlord and the tenant to maintain and improve the quality of housing."

On May 24, 1977, the City filed a complaint in the circuit court of Cook County for declaratory and injunctive relief alleging that various provisions of Create's lease agreements for certain premises commonly known as 1115-1133 Maple Avenue were violative of the Ordinance. The City requested that the circuit court declare null and void the provisions of the lease agreements which were found to be in violation of the Ordinance and enjoin Create from further violation of the Ordinance. In both its motion to dismiss and its answer, Create alleged that the enactment of the Ordinance exceeded the powers conferred upon the City, as a home-rule unit, by the Illinois Constitution. The trial court denied Create's motion to dismiss the City's complaint, finding that the City's exercise of its home-rule powers did not exceed its constitutional authority. Motions for summary judgment were filed by both the City and Create. The circuit court once again found that the Ordinance was a valid exercise of the City's home-rule powers and entered summary judgment in favor of the City, enjoining Create "from prosecuting or in any way giving further effect to certain clauses contained in certain leases * * *."

## I.

The powers of home-rule units are embodied in section 6 of article VII of the Illinois Constitution of 1970. This constitutional grant of home rule to local governments is a major change from the pre-existing scheme of local governmental power. Previously all local governments were required to find authority for their actions in State legislation. Section 6 conferred upon home-rule units a broad range of inherent powers which exist without the need for any action by the General Assembly. Section 6(a) provides that:

"Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt."

Section 6(m) instructs the courts that these "[p]owers and functions of home-rule units shall be construed liberally." In addition, section 6(i) provides that:

"Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent

that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive."

The mechanism by which the General Assembly may specifically deny or limit the exercise of a home-rule power by a home-rule unit is established by sections 6(g) and 6(h). Section 6(g) provides that:

"The General Assembly by a law approved by the vote of three-fifths of the members elected to each house may deny or limit the power to tax and any other power or function of a home rule unit not exercised or performed by the State other than a power or function specified in subsection (1) of this section."

Section 6(h) provides that:

"The General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit other than a taxing power or a power or function specified in subsection (1) of this Section."[2]

The grant of home-rule powers contained in section 6(a) is articulated in two parts. The first is very broad, extending to "any power" and "any function" which pertains to the government and affairs of the home-rule unit. This general grant is supplemented by an enumeration of four major powers which specifically fall within the realm of home rule— the power to regulate, license, tax and incur debt. Together these two parts are designed to ensure that the specified counties and cities receive directly under the constitution the broadest possible range of powers to deal with the problems facing them and with demands that are made upon them by their residents and by the greater society. (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1619.) Moreover, to avoid the danger that the courts may read the list as exclusive and as marking the outer boundaries of home-rule authority, section 6(a) provides that home-rule powers are "not limited" to the enumerated list,

---

[2] "Sections 6(g) and (h) permit the legislature to limit or deny home rule powers by a three-fifths vote of each house, and to exclude home rule units from a subject area by specifically declaring that the state shall operate exclusively in that area. Apart from these two methods of legislative supervision, home rule units are supposed to be free to carry on activities that relate to their communities even if the state also is interested and is active in the area. This idea is expressed in section 6(i), which provides that '[h]ome rule units may exercise and perform *concurrently with the State* any power or function of a home rule unit to the extent that the General Assembly by law does not *specifically* limit the concurrent exercise or *specifically* declare the State's exercise to be exclusive.' To the extent that state regulation is held to invalidate local power under the 'pertaining to ° ° °' language of section 6(a), the purpose of section 6(i) is undermined and defeated." ((Emphasis in original.) Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 154-55.

and section 6(m) instructs the courts that the powers and functions of home-rule units are to be "construed liberally."

The most general and uncertain limitation upon home-rule powers is found in the language of the home-rule grant itself. Section 6(a) gives a home-rule unit authority to exercise only those powers and to perform only those functions "pertaining to its government and affairs." The question, in the words of the late Professor David C. Baum, counsel to the constitutional convention's Local Government Committee, is "not whether the 'pertaining to [its government and affairs]' language should limit the home rule grant, but rather how extensive the limitation should be." (Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations,* 1972 U. Ill. L.F. 137, 153.) The troublesome question is the extent to which this court should by its interpretation of the "pertaining to" language determine the degree of limitation in view of the mechanisms of limitation granted the legislature by sections 6(g) and 6(h). Professor Baum explains:

> "Sections 6(g) and (h) permit the legislature to limit or deny home rule powers by a three-fifths vote of each house, and to exclude home rule units from a subject area by specifically declaring that the state shall operate exclusively in that area. Apart from these two methods of legislative supervision, home rule units are supposed to be free to carry on activities that relate to their communities even if the state also is interested and is active in the area. This idea is expressed in section 6(i), which provides that '[h]ome rule units may exercise and perform *concurrently with the State* any power or function of a home rule unit to the extent that the General Assembly by law does not *specifically* limit the concurrent exercise or *specifically* declare the State's exercise to be exclusive.' To the extent that state regulation is held to invalidate local power under the 'pertaining to * * *' language of section 6(a), the purpose of section 6(i) is undermined and defeated." (Emphasis in original.) (Baum, at 154-55.)

Professor Baum then advises that:

> "We should face squarely that section 6 grants broad powers to home rule units subject to restraints imposed primarily by the General Assembly either by a three-fifths vote or by a declaration of exclusive state jurisdiction under authority expressly reserved in sections 6(g) and 6(h). *The language does not contemplate substantial restraint added by judicial interpretation; indeed, it was designed to make this interpretation difficult if not impossible. A judicial preemption doctrine based upon the existence of legislative regulation was specifically frowned upon.*
>
> The design of section 6 places great responsibility upon the legislature to ensure that home rule does not degenerate into

provincialism which could injure the people of the state. This emphasis on legislative authority to limit home rule, plus the specification of ways in which the legislature must act to assert its authority, makes the Illinois home rule provision unique. Judicial limitations imposed on home rule in other states should not be very persuasive in Illinois because of our unique approach to the problem.

If the legislature does not perform its job, it is true that the people of the state may suffer. But that is, by and large, the fate mandated by section 6 of the Local Government Article. Certainly, the 'pertaining to * * *' language leaves some leeway for judicial intervention. But if the constitutional design is to be respected, the courts should step in to compensate for legislative inaction or oversight only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies." (Emphasis added.) Baum, at 156-57.

In summary, it would appear that, although the grant of home-rule powers in section 6(a) is indeed broad, it may be limited in two ways. First, the legislature may deny or limit pursuant to sections 6(g) and 6(h). Secondly, the grant of power in section 6(a) might be limited by judicial construction of the phrase "pertaining to its government and affairs." Although Professor Baum suggests that the role of the judiciary in controlling the possible abuse of home-rule power should be a limited one, it has also been as vigorously argued that no legislature could foresee all of the conflicts between the State policy on one hand and a multitude of home-rule policies on the other hand. (See Sandalow, *The Limits of Municipal Power under Home Rule: A role for the Courts*, 48 Minn. L. Rev. 643, 679 (1964); Vitullo, *Local Government: Recent Developments in Local Government Law in Illinois*, 22 DePaul L. Rev. 85, 93 (1972-1973).) In attempting to ascertain the respective role of the judiciary and the legislature in controlling the use of home-rule power, we make two observations. First, although Illinois constitutional home-rule concepts profoundly alter traditional principles of the State-local relationship, and although it requires no strong prisms to see the breadth and depth of home-rule powers, it cannot be logically concluded that it was the intent of the framers of section 6(a) to confer unlimited powers upon home-rule units. In its report to the constitutional convention the Local Government Committee explained that:

"It is clear, however, that the powers of home-rule units relate to their own problems, not to those of the state or the nation. Their powers should not extend to such matters as divorce, real property law, trusts, contracts, etc. which are generally recognized as falling within the competence of state rather than local authorities." (7 Record of Proceedings 1621.)

Secondly, our supreme court has held that by virtue of the general language of the grant and the qualifying phrase "pertaining to its government and affairs," the right of a home-rule unit to exercise any power depends upon an interpretation by that court as to whether or not the power exercised is within the grant of section 6(a). *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540, 338 N.E.2d 15.

## II.

In the preceding section we observed that the use of home-rule powers was not anticipated to extend to such matters as "divorce, real property law, trusts, contracts, etc. which are generally recognized as falling within the competence of state rather than local authorities." The rationale for excluding "such matters as divorce, real property law, trusts, contracts, etc." as matters "which are generally recognized as falling within the competence of state rather than local authorities" is implicit within the one characteristic shared by these areas of law. These areas of law are all matters of private law; that is, they govern civil relationships. Crucial to an articulation of this common characteristic is an understanding of the distinction between private law and public law. Black's Law Dictionary defines public law as "[t]hat branch or department of law which is concerned with * * * the definition, regulation and enforcement of rights in cases where the state is regarded as the subject of the right or the object of the duty * * *." Black's Law Dictionary defines private law "[a]s used in contradistinction to public law, * * * that part of the law which is administered between citizen and citizen, or which is concerned with the definition, regulation, and enforcement of rights in cases where both the person in whom the right inheres and the person upon whom the obligation is incident are private individuals." Public and private law are not always separated by a clear line of division. For example, it is a common practice for a court to refer to a municipal safety regulation, enacted pursuant to its police power, as a standard for determining whether an individual is guilty of negligence. In other words, the distinction is one of emphasis and viewpoint. A public law has as its focus and thrust a protection of the public interest. A private law essentially governs civil relationships, adjusting conflicts between individuals.

The grant of home-rule power has not generally been understood as authorizing municipalities to enact private law. "[I]t is beyond the power of a municipal corporation by its legislative action directly to create 'a civil duty enforceable at common law;' for this is an exercise of the power of the sovereignty belonging alone to the state." (*Sluder v. St. Louis Transit Co.* (1905), 189 Mo. 107, 133, 88 S.W. 648, 652.) However, we have already noted that Illinois' constitutional home-rule concepts profoundly alter traditional principles of the State-local relationship. The question

becomes to what extent does a home-rule unit have the power to define legal relationships between private individuals or to create new civil liabilities. Although the City obviously has an interest in protecting its citizens, reliance upon this interest alone would permit home-rule units to regulate any purely private legal relationship which in some manner is related to an area of concern to the home-rule unit. Were this the case, a home-rule unit, pursuant to its traditional powers to regulate the use of its streets could, presumably, enact an ordinance establishing comparative negligence, rather than contributory negligence, as a defense to all automobile accidents occurring on its streets. (Sandalow, *The Limits of Municipal Power under Home Rule for the Courts*, 48 Minn. L. Rev. 643, 676 (1964).) In Sandalow's words, "[i]t would be a singularly unimaginative municipal attorney who was unable to find a connection between some traditional municipal power and almost any private law which the council desired to enact."

On the other hand, we do not deny that the impact of public regulation on private rights is inevitable. For example, a zoning ordinance affects the use which a landowner may make of his property. We note, however, that the zoning regulation falls within the parameters of the definition of public law, that is, where the governmental unit is "the subject of the right or the object of the duty." This is not to say that public legislation may not have an indirect effect upon private rights. It is common practice for a court to hold that violation of a municipal traffic regulation constitutes negligence. It is crucial to note that in such cases the ordinance does not of its own force establish or create a cause of action for negligence. The State law establishes that right and the civil consequences if that right is found to have been violated. The ordinance is merely a standard used to determine if the duty of care imposed by State law was violated.

There may also be a middle ground. It could be argued that a private law may be enacted only if it is in aid of some home-rule policy or program which is expressed, at least in part, by means other than the regulation of purely civil relationships. For example, although a municipality presumably could not, as part of a safe driving program, eliminate contributory negligence as a defense and establish comparative negligence in its stead—since that would not be in aid of a municipal policy expressed independently of the regulation of private rights—it might provide that any person injured in consequence of the violation of a municipal speed limit is entitled to recovery of treble damages. (Sandalow, at 677.) The possibilities are endless.

While it is true that the legislature retains power to curb any abuses by home-rule units, if each of the innumerable cities and villages entitled to exercise home-rule powers were thereby empowered to adjust contract,

property and the host of other legal relationships between private individuals, the retention of this power by the legislature may be an inadequate solution to the problem. The legislature neither has knowledge of the countless ordinances promulgated by home-rule units nor time adequate to permit it to assume primary responsibility for the myriad of issues presented by private lawmaking at the local level. Although the legislature should, of course, have power to override decisions made by the courts, "we make ill use of the legislature when we ask it to even try to assume primary responsibility for all the questions of interstitial and subordinate policy making which come before the courts." (Hart, *Comment on Courts and Lawmaking*, in Legal Institutions Today and Tomorrow 45 (Paulson ed. 1959).) As Hart stated, "there is no substitute for the intensive analysis and creative exposition of principles and policies at the point at which general propositions come into contact with concrete situations * * *." This type of intensive analysis and creative exposition is well suited to, and is in fact, the task of the judicial forum.

In Illinois any extension of the home-rule power into the realm of private law appears to be unprecedented.[3] The Ordinance by its own provision seeks to "establish rights and obligations of the landlord and tenant in the rental of dwelling units and to encourage the landlord and the tenant to maintain and improve the quality of housing." In other words, the Ordinance seeks to define, regulate and enforce the rights of private individuals, the landlord and tenant. A review of the cases decided by our supreme court illustrates that in each instance the ordinance in question was an exercise of the home-rule unit's public lawmaking function. For example, the taxing ordinances of S. *Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, 284 N.E.2d 257, *City of Evanston v. County of Cook* (1972), 53 Ill. 2d 312, 291 N.E.2d 823, and *Jacobs v. City*

---

[3] In *Landry v. Smith* (1978), 66 Ill. App. 3d 616, 384 N.E.2d 430, the appellate court held that section 23½—4.101(b) was proper exercise of Evanston's home-rule power. Section 23½—4.101(b) provides that:

"[I]f rent is unpaid when due, and the tenant fails to pay the unpaid rent within ten (10) days after written notice by the landlord of his intention to terminate the rental agreement if the rent is not paid within ten (10) days, landlord may terminate the rental agreement."

The court noted at pages 620-21 that the question of whether a home-rule unit is empowered to regulate eviction procedures is a question of first impression in Illinois. This court then opined: "[a] city's regulation of the procedures by which a landlord can evict a tenant is certainly a matter of local concern." This court's discussion and analysis was confined to section 23½—4.101(b) of the Ordinance. It may be that the regulation of eviction proceedings, such as building codes and zoning ordinances, is a matter of public law. However, in the case at bar the entire Ordinance is attacked. The City in its brief devotes three sentences to the contention that Create has standing to challenge only those sections of the Ordinance which it was found to have violated. The remainder of the brief discusses the Ordinance in its entirety.

*of Chicago* (1973), 53 Ill. 2d 421, 292 N.E.2d 401, fall well within the scope of a home-rule unit's public lawmaking function. In those cases the home-rule unit was the object of the duty of the private citizen to pay the tax. See also *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553; *Peters v. City of Springfield* (1974), 57 Ill. 2d 142, 311 N.E.2d 107; *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 291 N.E.2d 807; *Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 290 N.E.2d 240.

Although the public/private law analysis is appealing and persuasive, it has not, to our knowledge, been applied by the Illinois courts nor specifically acknowledged by our legislature. We cannot by judicial fiat correct what some may perceive as the legislature's failure to anticipate the complexities created by such a broad and undefined grant of power, the difficulties of administration, and the potential for fragmentation and provincialism. Moreover, we acknowledge the admonition included in the report of the Illinois Assembly on Home Rule (April 5-7, 1973) that "the constitutional home rule concepts so profoundly alter traditional principles of state-local relationships that the judicial resolution of home rule issues, when presented in the context of limited and narrow problems, may result in the formulation of broad principles not in harmony with the perspectives of the new constitutional philosophy."[4] We are also mindful that our State Supreme Court has held that by virtue of the general language of the grant and the qualifying phrase "pertaining to its government and affairs," the right of a home-rule unit to exercise any power depends upon an interpretation by that court as to whether or not the power exercised is within the grant of section 6(a). *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540.

Judicial circumscription of municipal initiative under a grant of home rule has not been frequent or unduly restrictive.[5] In *City of Evanston v. County of Cook* (1972), 53 Ill. 2d 312, 319, our supreme court acknowledged that the possibility of abuse exists in the exercise of any power but opined:

> "The Report of the Committee on Local Government recognized the possibility of abuse of the home-rule powers and relied upon the authority of the General Assembly, preserved by section 6, to protect against these possible abuses. [Citations.] Under section 6(g) the General Assembly by a vote of three fifths of the members elected to each house may deny or limit the power of a home-rule unit to exercise its power * * *. Under this provision the General

---

[4] We note that the allocation of governmental power is fundamentally a political question. Judicial participation in the resolution of such political questions has through the years been the target of frequent criticism.

[5] The inevitable element of judicial discretion involved in permitting courts to limit municipal initiative plainly involves the risk that courts may unduly restrict that initiative.

Assembly may prevent or rectify the hardships which plaintiff envisage, should they occur."

If the constitutional design, which does not appear to contemplate substantial restraint on home-rule power by judicial interpretation, is to be respected, this court must acquiesce to the legislative authority to limit home-rule powers, as mandated by section 6.[6] Therefore, we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and DOWNING, JJ., concur.

---

[6] In so holding we are not suggesting that in no case is judicial intervention warranted. In the clearest cases of oppression, injustice, or interference by local ordinances with vital State policies, it is not only desirable but necessary for the courts to intervene to compensate for legislative inaction or oversight.