(No. 72315.—

# AMERICAN TELEPHONE AND TELEGRAPH COMPANY *et al.*, Appellees, v. THE VILLAGE OF ARLINGTON HEIGHTS *et al.*, Appellants.

*Opinion filed August 26, 1993.—Rehearing denied October 4, 1993.*

McMORROW, J., took no part.

FREEMAN, J., specially concurring.

BILANDIC, J., dissenting.

Jack M. Siegel, of Altheimer & Gray, of Chicago, for appellants.

Howard J. Trienens, Gerald A. Ambrose, J. Andrew Schlickman, Michelle M. Cain and John A. Heller, of Sidley & Austin, and Thomas R. Phillips, O. Carey Epps, Dennis S. Pines and Timothy L. Porter, all of Chicago, for appellees.

Kelly R. Welsh, Corporation Counsel, and Susan S. Sher, Acting Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Lynn Kristine Mitchell, of counsel), for intervenor-appellant City of Chicago.

Beth Anne Janicki, of Springfield, for *amicus curiae* Illinois Municipal League.

Seymour Simon, Thomas F. Geselbracht and John E. Mitchell, of Rudnick & Wolfe, of Chicago, for *amicus curiae* Western Union ATS, Inc.

Kevin M. Forde Ltd., of Chicago (Kevin M. Forde and Katrina Veerhusen, of counsel), for *amicus curiae* Illinois Telephone Association.

Boyd J. Springer and Thomas P. McNulty, of Jones, Day, Reavis & Pogue, of Chicago, for *amicus curiae* Illinois Chapter, National Association of Water Companies.

Herbert D. Hill, Assistant Corporation Counsel, of Evanston, for *amicus curiae* City of Evanston.

Mark C. Goldenberg, City Attorney, of Granite City, for *amicus curiae* City of Granite City.

John P. Kelliher, of Chicago, for *amicus curiae* Illinois Commerce Commission.

Erwin W. Jentsch, Michael R. Gehrman and William A. Cogley, of Elgin, for *amicus curiae* City of Elgin.

Robert J. Alfton, of Minneapolis, Minnesota, Joseph I. Mulligan, of Morris & Quinn, of Boston, Massachusetts, Robert J. Mangler, of Klein, Thorpe & Jenkins, of Chicago, Joseph N. De Raismes, of Boulder, Colorado, Frank B. Gummey III, of Daytona Beach, Florida, Benjamin L. Brown, Michael P. Moss and Donna Clemons-Sacks, of Washington, DC, Analeslie Muncy, of Fielding, Barrett & Taylor, of Fort Worth, Texas, David Caylor, City Attorney, of El Paso, Texas, Frederick S. Dean, City Attorney, of Tuscon, Arizona, James H. Epps III, City Attorney, of Johnson City, Tennessee, Neal M. Janey, City Solicitor, of Baltimore, Maryland, Iris J. Jones, City Attorney of Prairie View, of Small, Craig & Werkenthin, of Austin, Texas, Victor J. Kaleta, City Attorney, of Pasadena, California, William J. Kearns, Township Solicitor, of Willingboro, New Jersey, Patricia A. Lynch, City Attorney, of Reno, Nevada, Robert J.

Watson, City Attorney, of Overland Park, Kansas, and John J. Zimmermann, of Park Ridge, for *amicus curiae* National Institute of Municipal Law Officers.

JUSTICE HEIPLE delivered the opinion of the court:

The question presented by this case is whether municipal governments can extort toll charges or franchise fees for the crossing of public ways. They cannot. The factual context of this case is that AT&T is laying an underground fiber optic cable along an 85-mile line in northern Illinois between Glenview and Rockford. The line is being laid along railroad right-of-way of the Chicago and North Western Transportation Company (CNW) pursuant to an easement granted by CNW. The cable is designed to carry only long distance telephone communications. Additionally, telecommunications traffic can enter or leave the cable only at AT&T's terminal points in Glenview, Rockford, and Rolling Meadows.

In transversing the 85-mile cable route following the railroad right-of-way, the cable must pass under more than 140 travelled public ways subject to the jurisdiction of five counties, six townships, 13 cities and villages, plus the Illinois Department of Transportation, the Corps of Engineers and the Illinois Toll Authority. Five cities and villages in the path of this cable will not permit street crossings unless AT&T agrees to so-called franchise agreements or tolls which AT&T refused to pay. Various demands were made upon AT&T, including a percentage of gross revenues and $2.50 per foot of cable within the municipalities regardless of whether the cable was crossing the street or located entirely on CNW's property. It is to be noted that none of the municipalities object to the installation of the cable *per se*. They simply want to collect a toll for it.

In an action by the telephone company, the trial court initially entered a preliminary injunction in favor of the telephone company allowing the installation of the fiber optic cable without a franchise agreement. The appellate court, on an interlocutory appeal taken by the municipalities, affirmed the granting of the preliminary injunction, and the cause was subsequently returned to the trial court for a ruling on the permanent injunction. A permanent injunction barring the municipalities' interference with the installation of the fiber optic cable was entered by the trial court and the municipalities again appealed. The appellate court concluded that municipalities do not have an absolute right to require a franchise agreement as a prerequisite to a telephone company's utilization of the public streets. (216 Ill. App. 3d 474.) We allowed the municipalities' petition for leave to appeal and, in a split decision, reversed the appellate court. A majority of this court held that the municipalities have the right to prohibit AT&T from crossing public streets without a franchise agreement, and that the franchise agreement could require AT&T to pay rent for the crossing of the streets. Thereafter, AT&T's petition for rehearing was allowed (134 Ill. 2d R. 367), and the case was reargued. Today we rule that municipalities do not have a proprietary interest in the public streets and may not raise revenue by coercing telephone companies into franchise agreements.

## FACTS

The detailed factual background of this case is as follows. Plaintiffs, American Telephone and Telegraph Company, and AT&T Communications of Illinois, Inc. (hereinafter collectively referred to as AT&T), were laying an underground 85-mile long fiber optic cable between Glenview and Rockford, Illinois. The cable, pursuant to an easement granted to AT&T by the Chicago and North Western Transportation Company, was being in-

stalled below ground along the side of a railroad road-bed. The cable was located exclusively on CNW's private property except at points where the railroad roadbed intersected with public streets.

More than 140 streets, roads, and highways cross the Glenview/Rockford cable route, and except for the municipalities of Arlington Heights, Palatine, Barrington, Lake Barrington, and Crystal Lake, AT&T was able to receive the appropriate undercrossing permits for either no charge or by paying an administrative fee. AT&T was informed that the Northwest Municipal Conference would negotiate franchise agreements between AT&T and the defendant municipalities. Initially, the Northwest Municipal Conference proposed that AT&T enter into a franchise agreement similar to an existing agreement between AT&T and the City of Chicago. This agreement provided for the paying of 2% of AT&T's gross revenues derived from long-distance calls originating in the City of Chicago, or a minimum payment of $5 million per year. AT&T refused to accept this proposal.

The Northwest Municipal Conference offered an alternative proposal requiring AT&T to pay each of the defendant municipalities $2.50 per foot of cable installed within the municipality. This proposal made it immaterial whether the cable was undercrossing public streets or located on CNW's private property. AT&T also rejected this proposal and responded with its own offer of $1 per foot of cable located on the public right-of-way and paying an administrative fee of $5,000 per year. This proposal was rejected and an agreement was not reached.

In 1987, AT&T submitted permit applications to the defendant municipalities seeking permission to install the fiber optic cable beneath the street crossings. The Village of Lake Barrington initially granted a permit, but it was revoked prior to the installation of the fiber optic cable. The other defendant municipalities refused to is-

sue the permits. The rationale for denying AT&T's permit application was based upon the fact that a franchise agreement had not been entered into. However, none of the municipal ordinances required a permit applicant to enter into a franchise agreement in order to obtain a permit.

On August 11, 1987, AT&T mailed notices to the villages of Arlington Heights, Barrington and Palatine in an effort to invoke the eminent domain authority of telephone companies as specified in section 4 of the Telephone Company Act (Ill. Rev. Stat. 1987, ch. 134, par. 20). The notices gave the villages 10 days' notice that AT&T intended to begin constructing its fiber optic cable under various streets intersecting with the CNW railroad. A similar letter was mailed to the City of Crystal Lake on September 11, 1987. AT&T commenced work in the villages of Arlington Heights and Palatine. However, since permits had not been issued and a franchise agreement had not been entered into, the municipalities ordered AT&T to stop work.

AT&T filed a complaint against the defendant municipalities and sought a preliminary injunction to prevent their future interference in the installation of the fiber optic cable under the streets. During the injunction hearings, defendants maintained that "[r]equiring payment of a fee as a condition for use of *** property by a commercial enterprise is a legitimate means of raising revenue." Defendants also took the position that AT&T had "no right whatsoever" to undercross their streets, and that they have an "absolute right to exclude" AT&T from any use of public streets except on such terms as they may demand.

On November 2, 1987, the trial court entered an interlocutory order granting a preliminary injunction in favor of AT&T which allowed them to "construct, maintain, lay, alter, bore or locate and use its fiber optic cable

along, upon, under, and across any highway, street, road, or alley under the control or claimed control of the defendants." Additionally, the injunction ordered arbitration between AT&T and the defendant municipalities. Subsequently, defendants appealed from the interlocutory order and the appellate court affirmed that part of the injunction authorizing AT&T's use of the public streets within the municipalities and reversed the part ordering arbitration to take place. *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, *appeal denied* (1988), 123 Ill. 2d 555.

On May 2, 1989, AT&T filed a motion before the trial court to convert the preliminary injunction to a permanent injunction. A permanent injunction was entered and the trial court determined that AT&T had the right to locate the fiber optic cable beneath the streets of the defendant municipalities pursuant to the Telegraph Act (Ill. Rev. Stat. 1987, ch. 134, par. 4) and the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 13—202). Additionally, the court ruled that AT&T had the right to operate the cable without interference or disruption by the defendant municipalities. Defendants appealed, and the appellate court, with one justice dissenting, affirmed the trial court, concluding that municipalities do not have an absolute right to require a franchise agreement of a telephone company and that such an agreement is not a necessary precondition for the utilization of the public streets by AT&T. (216 Ill. App. 3d 474.) We now affirm the appellate court.

## DISCUSSION

Defendants claim that they have the right to require revenue-raising franchise agreements or tolls as a precondition to the use of public streets by telephone companies. While municipalities have the authority to enact

regulations relating to the use of the public streets and to charge reasonable regulatory fees for such use, they do not have the authority to hold the public streets hostage as a means of raising revenue. (*Village of Lombard v. Illinois Bell Telephone Co.* (1950), 405 Ill. 209, 217-18.) Defendants, by classifying their current attempt to raise revenue as franchise agreements, are attempting to circumvent both this court's previous holdings prohibiting municipalities from charging rent for the use of city streets (*Village of Lombard*, 405 Ill. at 216) and the statutory requirement that the taxing of a telecommunications company must be based upon the business originating within the corporate limits of the municipality (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2(1)).

It needs to be borne in mind that AT&T is not seeking permission to use city streets for the operation of a business within city limits such as a garbage collection service, a street railway, a cable TV franchise, etc. That is to say, they do not seek to garner revenue from the use of city streets. What is sought here is different in character from what would normally be considered a franchise-type business seeking protection, licensing and special privileges for the use of city streets. No person or entity within any of the municipalities in this case is to be connected to or have the use of the fiber optic cable which is sought to be laid. All that plaintiffs seek here is to get from one side of town to the other.

Regardless of the name given to this particular method of revenue enhancement, whether it is called a franchise, a rental fee or a tax, it is, in its essence, a toll. Parenthetically, it is to be noted that there are 1,281 cities and villages in Illinois, 102 counties and 1,434 townships, each of which maintains travelled ways. If each of these governmental units had the right to charge tolls for conduits going under and over their streets, the

effect would amount to legalized extortion and a crippling of communication and commerce as we know it.

Municipalities do not possess proprietary powers over the public streets. They only possess regulatory powers. The public streets are held in trust for the use of the public. While numerous powers and rights regarding public streets have been granted to municipalities by the General Assembly, they are all regulatory in character, and do not grant any authority to rent or to lease parts, or all, of a public street. *Village of Lombard*, 405 Ill. at 216.

Defendants cite several cases as authority for the proposition that the right to demand a franchise fee is an exercise of the municipalities' proprietary power over public property. The principal cases relied on by the defendants, however, were all decided prior to this court's decision in *Village of Lombard v. Illinois Bell Telephone Co.* (1950), 405 Ill. 209. (See *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253.) In *Village of Lombard*, this court held that the powers a municipality has over its streets are all regulatory in character and a municipality has no authority to rent part or all of the public streets. (*Village of Lombard*, 405 Ill. at 216.) It has been argued that the *Lombard* decision is no longer good law, because five years after it was announced, the General Assembly amended the Revised Cities and Villages Act to include a provision allowing municipalities the right to collect compensation for the use of public streets. (Ill. Rev. Stat. 1955, ch. 24, par. 23—113.) Today the relevant statutory section provides:

> "Any of the taxes enumerated in this section may be in addition to the payment of money *** to the municipality *** as compensation for the use of its streets ***

or installation and maintenance \*\*\* thereunder of \*\*\* wires \*\*\*." (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2(4).)

This section neither allows municipalities to tax the user of public streets nor does it allow the taxation of wires under the streets. This section is purely regulatory in nature. The General Assembly, at the same time that the above provision was added, also added what is today section 8—11—2(1) of the Illinois Municipal Code. Section 8—11—2(1) authorizes municipalities to impose a 5% tax on the gross receipts of a person engaged in the business of transmitting electronic messages. The gross receipts to which the tax applies are limited to the business which originates within the corporate limits of the municipality. (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2(1).) If the General Assembly intended to give municipalities the right to use the public streets as revenue-raising devices, it would have been unnecessary to explicitly provide for a way to tax electronic messages and to impose a 5% cap upon such a tax. It is reasonable to conclude that the General Assembly, by allowing municipalities to collect money for the use of streets and the installation and maintenance of wires under the streets, simply reinforced the regulatory power municipalities have over public streets. To conclude otherwise would render the express taxing provisions meaningless. Thus, municipalities only have regulatory powers over public streets and cannot charge tolls for their use.

The character of defendants' last proposal made to AT&T did not meet the scope of the permissible tax allowed by section 8—11—2(1) (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2(1)). Rather than being based upon the business originating within the corporate limits of the various municipalities as required by the statute, it attempted to collect $2.50 for each foot of cable installed within the municipalities, regardless of whether the cable was located on public or private property. The villages of

Arlington Heights and Palatine are both home rule municipalities. As such, their powers are to be liberally construed. (Ill. Const. 1970, art. VII, §6.) However, the power of a home rule municipality to levy a tax is limited to issues of local rather than statewide concern. (*People ex rel. Bernardi v. City of Highland Park* (1988), 121 Ill. 2d 1, 12-13.) A telephone company which is running a fiber optic cable across the State and through various municipalities is not a matter of purely local concern and is an issue of statewide concern. Thus, the fact that the villages of Arlington Heights and Palatine are home rule municipalities does not permit this type of franchise agreement to be imposed upon AT&T.

Defendants rely heavily upon *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, for the proposition that a franchise agreement may be required prior to a public utility's utilization of the public streets. While this court in *Geneseo* stated that the Public Utilities Act did not affect the power of municipalities to permit or refuse a franchise to a public utility (*Geneseo*, 378 Ill. at 530), that case did not involve the power of a municipality to tax for the use, or rent, of the public streets. Additionally, *Geneseo* did not involve a telephone company or the Telephone Company Act. Ill. Rev. Stat. 1987, ch. 134, par. 20.

Under section 4 of the Telephone Company Act, telephone companies are granted eminent domain authority over private property and the power to use any public ground of this State which is necessary for the extension of telephone poles, wires, cables or other appliances. (Ill. Rev. Stat. 1987, ch. 134, par. 20.) In relevant part, section 4 provides:

"Every *** [telephone] company may, when it shall be necessary for the construction *** of its telephone system *** enter upon, take or damage private property *** and every such company is authorized to construct ***

poles, wires, cables and other appliances as a proper use of highways, \*\*\* *under* and across any highway, *street*, alley, water or *public ground* in this state, but so as not to incommode the public in the use thereof: Provided, that nothing in this act shall interfere with the control now vested in cities, \*\*\* and villages in relation to the *regulation* of the poles, wires, cables and other appliances, and provided, that before any such lines shall be constructed along any such highway it shall be the duty of the telephone company \*\*\* to give to the highway commissioners having \*\*\* control over the road \*\*\* along \*\*\* which such line is proposed to be constructed [10 days written notice of the company's purpose and intention. It is then the duty of the highway commissioners] to specify the portion of such road or highway upon which the said line may be placed \*\*\*; [if the] highway commissioners shall, for any reason, fail to make such specification within ten days after the service of such notice, then the \*\*\* [telephone] company \*\*\* may proceed to place \*\*\* its \*\*\* abutments so as not to interfere with other proper uses of said road or highway." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 134, par. 20.)

This section gives telephone companies the authority to lay wires under public streets.

Defendant municipalities, relying on section 4 of the Telegraph Act (Ill. Rev. Stat. 1987, ch. 134, par. 4), argue that this statute does not give AT&T the authority to undercross their streets without prior consent. Section 4 of the Telegraph Act states that telegraph companies must receive written consent of a municipality prior to the construction of telegraph equipment. (Ill. Rev. Stat. 1987, ch. 134, par. 4.) Section 20 of the Telephone Act states that telephone companies may begin construction of a telephone line along a highway after giving the appropriate highway commissioners 10 days' written notice. (Ill. Rev. Stat. 1987, ch. 134, par. 20.) Since highway commissioners do not have control over municipal streets which are not part of the State or

county highway system, the 10-day notice provision does not apply to proposed construction of telephone lines along such streets. (*People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260.) Thus, a telephone company must seek municipal consent prior to constructing its equipment along or under municipal streets. However, the consent of the municipality may not be unreasonably withheld, or refused for an improper reason. Collection of a toll is an improper reason. If the construction request is reasonable in light of factors such as public health, safety, necessity and convenience, municipal consent must be promptly given. (*City of Vandalia v. Postal Telegraph-Cable Co.* (1916), 274 Ill. 173, 176-77.) Analogous to the aforesaid 10-day notice requirement, municipalities should reasonably respond to a telephone company's request within 10 days. Since the record reveals that AT&T's proposed undercrossing of municipal streets would not interfere with the public health, safety, necessity or convince, consent should have been given.

While AT&T and the defendant municipalities could have voluntarily entered into a contractual relationship under which AT&T would have agreed to pay for the undercrossing of public streets, absent such an agreement, defendants do not have the right to force AT&T to pay a toll under the guise of a franchise agreement. Additionally, it is immaterial that the defendants have been able to coerce other companies into similar agreements or that AT&T has been coerced into such agreements in the past. The mere fact that AT&T chose not to litigate every wrong thrust upon it does not prevent it from asserting its rights at the present time. Defendants' only interest in the public streets is regulatory in nature. As such, any payment to which defendants would be entitled should only cover actual costs, including inspection,

regulatory, administrative and repair costs associated with the tunneling under public streets.

The fact that AT&T seeks to undercross certain streets in this case with a fiber optic cable results in no intrusion on, or diminution of, the use or safety of the streets. The fact that AT&T is a for-profit corporation is of no moment. One may reasonably ask, if the Salvation Army or the Sisters of St. Francis were proposing to lay a fiber optic cable, would the law be otherwise? It would not. Municipal governments, whether home rule or non-home-rule, are creatures of the Illinois Constitution. (Ill. Const. 1970, art. VII, §§6, 7.) They have no other powers. Nothing in the Illinois Constitution or Illinois statutory law authorizes cities and villages to charge tolls for the crossing of the streets. If the plaintiffs were carrying phone messages in trucks commuting between Glenview and Rockford (if such can be imagined), instead of carrying the messages on a fiber optic cable, the municipalities would not be authorized to stop the plaintiffs' trucks and charge them tolls as they crossed municipal boundaries. The streets exist for the benefit of the entire public and are subject only to reasonable regulations regarding usage. Streets do not exist and were not created as either obstructions or revenue-producing property for municipalities.

For the reasons set forth above, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE McMORROW took no part in the consideration or decision of this case.

JUSTICE FREEMAN, specially concurring:

Today this court holds municipalities may not exact rent from telecommunications companies met with the obstacle of crossing public streets in the laying of fiber

optic cable along private rights of way. I agree. I join in the conclusion that plaintiffs, collectively referred to as AT&T, can only be charged fees associated with the cost of installing the cable beneath the pavement.

But my agreement is limited to the facts of this case. I believe there is too little to tie AT&T to the municipalities by virtue of the particular presence of cable to justify fees amounting to rent. The communications service made possible through the network of cable does not originate or terminate within the municipal boundaries. It merely happens that completion of the network requires AT&T to snake the cable alongside railroad track into and out of the municipalities, inevitably intersecting public streets. AT&T is just passing through, as it were.

I am reluctant, however, to preclude the possibility that different circumstances could justify the types of fees sought to be imposed here. The closer a private entity is joined, economically speaking, to a municipality through use of municipal property, the stronger the argument for fees amounting to rent becomes. A realistic uncertainty as to the nature and extent of future uses of municipal property convinces me that the facts of this case provide no reason to assert such fees could never be proper.

The particular facts also suggest a second, separate point. The majority concludes municipalities do not enjoy proprietary power over public streets. That conclusion seems to beg a more fundamental question: Is a proprietary power implicated by the use at issue here?

The use is the existence of fiber optic cable buried beneath streets for a distance sufficient to traverse street width. Initial installation of the cable is not the use that it is argued justifies the fees sought to be imposed. The use is the presence of cable.

That presence, without other circumstances marrying the use to the municipalities, does not seem to be a use

of public property at all, to say nothing of it being an extraordinary one. Unquestionably, such use is different from that which this court has before encountered in determining the propriety of fees amounting to rent in connection with use of public streets. Such use can be characterized as one that compromises enjoyment by the public of the whole of city streets for their normal object: facilitating travel.

For example, in *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324, and *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346, rental fees imposed under a municipal ordinance were deemed proper where a telephone and telegraph company exclusively appropriated portions of streets with poles. In *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253, rental fees were held appropriate for the occupation of city streets by track for a street railway system. There, the court noted that the effect of the use on the public in part justified the fees imposed. Specifically, the railway system on streets designed for normal traffic interfered with normal travel and would encourage avoidance of that street. (*Chicago General Ry. Co.*, 176 Ill. at 257.) Greater expense and maintenance would be necessary for those streets where track was present as well as others used as alternative routes. *Chicago General Ry. Co.*, 176 Ill. at 257.

Incidentally, this court's decision in *Broeckl v. Chicago Park District* (1989), 131 Ill. 2d 79, involving neither a street nor the provision of a public service, can be similarly explained. An occupied mooring impedes both the use of that mooring by other members of the boating public and public access, generally, to that portion of the body of water.

It seems right that a municipality, as an arm of the public, could impose fees amounting to rent to the extent that a private endeavor affects normal use of streets, ul-

timately the public's property. (See *Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 206-07.) If the justification for such fees depends on recognizing a municipal proprietary power, so be it. If the power is to be limited to situations where the public's use of public property is compromised (see *Postal Telegraph-Cable Co.*, 253 Ill. at 353), fine. After all, as the majority accurately notes, a municipal government can be said to own public property only as trustee for the public.

But the facts of this case do not provide much reason to debate whether a municipal proprietary power exists. Existence of fiber optic cable under streets does not impede the public's enjoyment of the whole of city streets for permitting travel over and upon. The need to declare that no municipal proprietary power exists is eliminated by the absence of a type of use sufficient to invoke it.

This court has spoken inconsistently on the issue. (See *Village of Lombard v. Illinois Bell Telephone Co.* (1950), 405 Ill. 209, 216 (stating that powers legislatively granted to municipalities concerning streets are regulatory and do not grant any authority to rent parts of public streets); *Inter-State Independent Telephone & Telegraph Co.*, 279 Ill. at 327 (stating that fees amounting to rent for a public service corporation's occupation of city streets is the exercise of a proprietary power); *Postal Telegraph-Cable Co.*, 253 Ill. at 353 (stating that rental charges similar to those imposed on telegraph and telephone companies may be imposed on public service companies, not by way of rental but in the exercise of police power); *Chicago General Ry. Co.*, 176 Ill. at 257 (stating that use of a graded street constitutes a bonus permitting a rental fee); see also *Broeckl*, 131 Ill. 2d at 86, quoting *Inter-State Independent Telephone & Telegraph Co.*, 279 Ill. at 327.) The inconsistency is not remedied by the majority's declaration today that no proprietary power exists. I would not discount such municipal power

without greater exploration by the court as to why that should be so.

JUSTICE BILANDIC, dissenting:

As the sole survivor of the *old majority* (*AT&T v. Village of Arlington Heights* (December 4, 1992), No. 72315), it is incumbent upon me to respond. (Justices Clark, Moran and Cunningham retired in December 1992.) The three-member *old minority* did not suffer any attrition. With the addition of two new members to their ranks, the *old minority* has been transformed into the *new majority*. I hasten to add my congratulations and respectful dissent.

The *new majority* opinion is substantially the same as the *old dissent*. The few changes did not, in my judgment, rehabilitate a fatally flawed argument.

There is no need to unduly burden this dissent with a restatement of the arguments made in the prior majority opinion, which is attached as an appendix to this dissent, since they can be incorporated by reference to the December 4, 1992, opinion. This dissent will be confined to additional argument.

I

It is significant to note that AT&T is not being *denied* the *ordinary use of the streets* of any of the municipalities. The most casual observer would have little difficulty in observing AT&T vehicles and personnel using the streets of the defendant-municipalities *in an ordinary manner* in common with other users.

The new majority opinion unwittingly authorizes AT&T to levy a tax on the residents of the municipalities and exact a subsidy from them for the construction of a cable system so that AT&T could achieve a maximum profit and an advantage over its competitors. To accom-

plish this end, the new majority has abandoned its judicial function and undertaken a legislative function.

In sum, AT&T demands that the municipalities give it something for nothing while at the same time paying a private railroad a "substantial" amount of money for the same service. In addition, AT&T would have to expend substantial sums of money to complete its cable system under any other option available to it. The municipalities are already financially strapped. The majority has given the green light to other private profit-making organizations to get in line and demand free service from municipalities upon whom they are conferring no benefit.

Commenting on "The Judge as a Legislator," Justice Benjamin N. Cardozo offered this advice:

> "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." B. Cardozo, The Nature of the Judicial Process 141 (1921).

The new majority's opinion is unconstitutional in that it violates both the fundamental doctrine of the separation of powers and the fundamental rights guaranteed by the fourteenth amendment of the United States Constitution.

Under the guise of statutory construction, the majority has judicially rewritten fundamental Illinois law governing municipal powers and authority granted to municipalities through the Illinois Constitution of 1970 and through legislation passed by the General Assembly. The Illinois Constitution guarantees to every citizen of Illi-

nois the constitutional right to a system of government based on the principles embodied in the separation of powers doctrine. Under this doctrine, each branch of our government is a co-equal branch with powers and authority of its own which cannot be encroached upon by the other branches. Under the separation of powers doctrine, the judiciary may not usurp or encroach upon the legislature's powers or the legislative function. (*Fergus v. Marks* (1926), 321 Ill. 510, 513-14.) The constitutional right to a system of government which operates according to the separation of powers doctrine is a vested right of each citizen in Illinois and, as such, is a right of United States constitutional dimension entitled to Federal constitutional protection.

## Home Rule Municipalities

Initially, it must be noted that home rule units did not exist in this State until after the ratification of the 1970 Illinois Constitution. As a result, all of the cases that specifically discuss municipal power and control over its streets, which precede the 1970 Constitution, involve only the *statutory* power of municipalities that were *not* home rule units. Consequently, those cases do not control the issue before this court with respect to the home rule defendant-municipalities.

As stated, the Illinois Constitution of 1970 established the existence, powers, and authority of home rule units in Illinois. (Ill. Const. 1970, art. VII, §6.) Under the Illinois Constitution, home rule units may, subject to a few constitutional limitations, "exercise any power and perform any function pertaining to its government and affairs." (Ill. Const. 1970, art. VII, §6(a).) The constitution further mandates that the "[p]owers and functions of home rule units *shall be construed liberally.*" (Emphasis added.) (Ill. Const. 1970, art. VII, §6(m).) These constitutional provisions

were "written with the intention that home rule units be given *the broadest powers possible.* (Ill. Ann. Stat., 1970 Const., art. VII, §6, Constitutional Commentary, at 24 (Smith-Hurd 1971).)" (Emphasis added.) (*Scadron v. City of Des Plaines* (1992), 153 Ill. 2d 164, 174-75.) The constitutional home rule provisions were designed to revolutionize the relationship between the State and home rule units of local government. *Triple A Services, Inc. v. Rice* (1989), 131 Ill. 2d 217, 230.

The drafters of the constitution intended to grant home rule units greater power and autonomy than was previously enjoyed by non-home-rule units. (*Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 166.) It was the intent of the drafters to grant home rule units the authority to exercise any power and perform any function *concurrently with the State,* unless the General Assembly *specifically* limits the concurrent exercise of such power or *specifically* declares that the State's exercise is exclusive. (Ill. Const. 1970, art. VII, §6(i); *Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 502-07.) " ' "[H]ome rule units are supposed to be free to carry on activities that relate to their communities even if the state also is interested and is active in the area." ' (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 510-11, quoting Baum, *A Tentative Survey of Illinois Home Rule (Part 1): Powers and Limitations,* 1972 U. Ill. L.F. 137, 155.)" (*Scadron,* 153 Ill. 2d at 175.) As counsel to the constitutional convention's Committee on Local Government, Professor Baum explained "that the government and affairs language of section 6 'does not contemplate substantial restraint added by *judicial interpretation*; indeed, it was designed to make this interpretation difficult if not impossible. *A judicial preemption doctrine based upon the existence of legislative regulation was specifically frowned upon.*' 1972 U. Ill. L.F. at 156."

(Emphasis added.) (*Scadron*, 153 Ill. 2d at 175-76.) The constitutional intent and purpose of the home rule provisions was to severely limit the judiciary's ability to preempt home rule powers through judicial interpretation of unexpressed legislative intent. (*Scadron*, 153 Ill. 2d at 186.) In this case, the new majority has accomplished precisely what these constitutional provisions were designed to prevent: the new majority has, under guise of judicial interpretation and in the absence of any legislative indication, entirely denied and preempted fundamental home rule powers and authority.

Without citation to *any* authority, the new majority has determined for itself, in contravention of the separation of powers doctrine, that:

> "[m]unicipalities do not possess proprietary powers over the public streets. They only possess regulatory powers." (156 Ill. 2d at 409.)

The new majority erroneously continues:

> "While numerous powers and rights regarding public streets have been granted to municipalities by the General Assembly, they are all regulatory in character, and do not grant any authority to rent or to lease parts, or all, of a public street. *Village of Lombard*, 405 Ill. at 216." 156 Ill. 2d at 409.

In regards to home rule units, there are several fundamental flaws in the new majority's assertions. First, the new majority has failed to distinguish between home rule municipalities and non-home-rule municipalities, which possess different powers and authority. Second, home rule units' powers and authority *are not derived from or dependent upon grants of authority from the General Assembly*. (*Triple A Services, Inc.*, 131 Ill. 2d at 230.) Home rule units derive their powers and authority directly from the 1970 Constitution. (*Triple A Services, Inc.*, 131 Ill. 2d at 230.) Thus, the extent of home rule power is not determined or limited by the

extent of powers that the General Assembly has granted to other municipal bodies. Third, *Village of Lombard*, the case cited by the new majority for its sweeping but erroneous proposition that municipalities have no power to *rent or lease their property*, was decided long before the ratification of the 1970 Constitution and its home rule provisions. Therefore, it provides no authority for the new majority's assertion with respect to home rule municipalities.

It is clear that *Village of Lombard* does not encompass or control the issue before us with respect to the instant home rule municipalities. It is undisputed that *Village of Lombard* involved a municipality that was *not* a home rule unit. *Village of Lombard* encompassed only the question of whether the village was properly exercising its *statutory* authority. Therefore, it provides no authority for the new majority's assertion with respect to home rule municipalities. See *Triple A Services, Inc.*, 131 Ill. 2d at 231.

Contrary to the new majority's unsupported, blanket assertion that municipalities have no proprietary power to enter into franchise agreements and charge a fee in the nature of rental for the extraordinary use of their streets, home rule municipalities, in matters pertaining to their government and affairs, possess the "same powers as the sovereign, except where such powers are limited *by the General Assembly*." (Emphasis added.) (*Triple A Services, Inc.*, 131 Ill. 2d at 230; *City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 273.) It cannot seriously be argued that the sovereign has no proprietary power over the *extraordinary use of its streets* for private gain. Likewise, a home rule municipality, in the absence of clear legislative preemption or limitation, possesses proprietary powers over its public property.

Although home rule powers are not dependent upon any legislative grant of authority, the legislature has explicitly recognized a municipality's proprietary powers over its public property on many occasions. (See, *e.g.*, Ill. Rev. Stat. 1987, ch. 24, par. 11—74.2—10 (power to acquire and convey its property in redevelopment area to school or park authorities and charge any price agreed upon by the parties; power to grant easements to public utilities *with or without charge*); par. 11—74.2—14(1) (power to transfer and sell fee simple title, or any lesser estate, to real property in redevelopment area to, *inter alia*, private corporations); pars. 11—75—1, 11—75—2 (power to lease space over any street, alley or public place); par. 11—76—4.1 (power to sell surplus public real estate); par. 11—121—8 (power to, *inter alia*, lease subways for transportation purposes); par. 11—80—3 (power to *prevent* or remove *encroachments* or obstructions upon its streets and property).) In fact, the legislature has also recognized the power of municipalities to enter into franchise agreements with public utilities. See, *e.g.*, Ill. Rev. Stat. 1987, ch. 24, par. 11—117—6 (municipality may reserve rights in *franchise* granted to public utility company); par. 11—117—7 (municipality may acquire public utility operating under, *inter alia*, a *franchise*); par. 11—119.1—5(J) (municipal power agency may grant the use of any property or facility owned by it by *franchise*, lease or otherwise).

A home rule municipality's power and authority is even broader than the above-cited proprietary powers granted by the legislature to other municipal bodies. As stated, home rule powers, in the first instance, were intended to be as broad as possible. Home rule municipalities may exercise any power and perform any function concurrently with the State, unless the legislature specifically limits the concurrent exercise of

such power or specifically declares that the State's exercise of such power is exclusive. (See *Kalodimos*, 103 Ill. 2d at 502-07.) In the absence of express legislative action to limit or preempt home rule power, the power of the instant home rule municipalities to require AT&T to enter into a franchise agreement and pay as rental a franchise fee for an easement in their streets is valid because it pertains to these municipalities' "government and affairs." This constitutional limitation on home rule powers has been interpreted to mean that " ' "the powers of home-rule units relate to their own problems, not to those of the state or the nation." ' *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 5." (*Kalodimos*, 103 Ill. 2d at 501.) Whether a problem or issue is of statewide or local dimension must be decided " 'with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and Statewide authorities in dealing with it.' " *Scadron*, 153 Ill. 2d at 176, quoting *Kalodimos*, 103 Ill. 2d at 501.

The new majority merely asserts, without citation to any authority, that because AT&T's construction of its fiber optic cable across the State "is not a matter of purely local concern and is an issue of statewide concern," home rule units have no power to impose a franchise agreement upon AT&T for its extraordinary use of their streets. (156 Ill. 2d at 411.) This court has repeatedly rejected the new majority's premise that home rule powers may not extend to matters which touch issues of statewide concern. (See *Scadron*, 153 Ill. 2d at 175.) Indeed, this court has repeatedly held that *even matters extensively regulated by the State are matters which properly fall within the exercise of a home rule municipality's power.* (See, *e.g.*, *Scadron*,

153 Ill. 2d 164 (home rule municipality may regulate outdoor advertising signs and displays even in the face of extensive Federal and State legislation); *Kalodimos*, 103 Ill. 2d 483 (home rule unit may adopt gun control regulations even in the face of Federal and State constitutional provisions as well as extensive State legislation).) In fact, our constitution provides that home rule units may exercise powers *concurrent with the State.* Ill. Const. 1970, art. VII, §6(i).

Requiring AT&T to enter into a franchise agreement for the extraordinary use of their streets for private gain is a matter pertaining to the government and affairs of these home rule municipalities and, therefore, falls within the proper exercise of home rule powers. (See Ill. Ann. Stat., 1970 Const., art. VII, §6, Constitutional Commentary, at 24 (Smith-Hurd 1971).) A municipality has a greater and more vital interest than the State in determining the conditions under which the public property located entirely within its boundaries may be used *for private gain.* Control over the use of a municipality's streets has traditionally been vested in the local government. (See, *e.g.*, Ill. Rev. Stat. 1987, ch. 24, par. 11—80—1 *et seq.*) Indeed, this court has recognized that the right to exercise control over the use of streets, including the right to grant or to withhold that use from utilities, is a matter of local rather than statewide concern. See *Triple A Services, Inc.*, 131 Ill. 2d at 237; *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506.

In the instant case, however, the new majority is even more blatantly remiss in its erroneous conclusion because the legislature has expressly indicated that it considers AT&T's use of a municipality's streets to be an affair of the local government. The Telegraph Act *expressly requires the public utility to obtain the municipality's consent in order for it to lay its cable*

*within the municipality's boundaries.* (Ill. Rev. Stat. 1987, ch. 134, par. 4; *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275.) Additionally, the statute which grants AT&T the authority to lay its cable expressly provides that the utility's statutory authority shall not interfere with the control already vested in the municipalities. (Ill. Rev. Stat. 1987, ch. 134, par. 20; *Shallberg,* 232 Ill. at 276.) Therefore, it cannot seriously be argued that the conditions under which a municipality will allow a utility to use its streets in an extraordinary manner *for private gain* is not a matter of local concern subject to the home rule powers of the municipality.

Our courts have upheld similar acts as valid exercises of home rule powers. See, *e.g., Crain Enterprises, Inc. v. City of Mound City* (1989), 189 Ill. App. 3d 130 (city ordinances granting a business a railroad franchise and vacating public streets for the economic benefit of the city and its citizens constituted legitimate exercises of city's home rule powers, where streets were wholly within city borders and did not form link in State highway); *Krughoff v. City of Naperville* (1976), 41 Ill. App. 3d 334 (ordinance requiring contribution of land, or money in lieu of land, for school and park sites as a condition to approval of a subdivision plat is a valid exercise of home rule powers), *aff'd on other grounds* (1977), 68 Ill. 2d 352; see also *Kalodimos,* 103 Ill. 2d at 501 (ordinance banning possession of operable handguns pertained to the municipalities' "government and affairs"); *City of Evanston v. Create, Inc.* (1980), 84 Ill. App. 3d 752 (residential landlord and tenant ordinance is a valid exercise of city's home rule powers), *aff'd* (1981), 85 Ill. 2d 101; *City of Chicago v. Pioneer Towing, Inc.* (1979), 73 Ill. App. 3d 867 (ordinance requiring towing companies to bear the cost of posting signs indicating that

unauthorized cars would be towed from premises which company serviced is a valid exercise of home rule powers).

Clearly, in light of the above, home rule units, in the first instance, have the constitutional authority to require a public utility to enter into a franchise agreement and to pay a rental fee for the extraordinary use of their streets for private gain. Such a requirement is a proper exercise of a home rule municipality's proprietary power over its property and pertains to its "government and affairs."

## Separation of Powers

The new majority's denial of this home rule power flies in face of constitutional provisions and amounts to a legislative act. Our 1970 Constitution provides that home rule powers and authority may only be limited or preempted *by the General Assembly.* (See Ill. Const. 1970, art. VII, §§6(h), (i).) Section 6(h) of article VII provides:

> "The *General Assembly* may provide *specifically* by law for the exclusive exercise by the State of any power or function of a home rule unit ***." (Emphasis added.) (Ill. Const. 1970, art. VII, §6(h).)

Section 6(i) of article VII provides:

> "Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the *General Assembly* by law *does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive.*" (Emphasis added.) Ill. Const. 1970, art. VII, §6(i).

Pursuant to these constitutional provisions, the *legislature* may only preempt or restrict home rule powers *if it specifically and expressly states its intent to do so.* (*Scadron,* 153 Ill. 2d at 185-88; *Kalodimos,* 103 Ill. 2d at 503; *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d

523, 528; *Rozner v. Korshak* (1973), 55 Ill. 2d 430, 435.) Nowhere in our statutes has the legislature expressly stated its intent to limit, deny, or preempt the proprietary powers of home rule units over their streets. (*Cf. Scadron*, 153 Ill. 2d at 188-89; *Rozner*, 55 Ill. 2d at 435.) It is only the new majority of this court that has done so in contravention of our constitutional home rule provisions and our legislature's intent. The judiciary, however, has no power to limit, deny, or preempt valid home rule powers and authority. On the contrary, *the home rule provisions were specifically drafted in their present form to eliminate the possibility that courts might preempt or limit home rule powers through judicial interpretation. Scadron*, 153 Ill. 2d at 175-76, 186.

The new majority's judicial encroachment upon and usurpation of the legislature's exclusive constitutional authority to limit home rule powers violates our State constitutional right to be governed by a system of government based upon the separation of powers. Article II, section 1, of the Illinois Constitution of 1970 provides:

> "The legislative, executive and judicial branches are separate. *No branch shall exercise powers properly belonging to another.*" (Emphasis added.) (Ill. Const. 1970, art. II, §1.)

As this court has previously stated:

> "By [the Illinois constitution] the powers of the government of this State are divided into three distinct departments,—the legislative, executive and judicial,—and no person or collection of persons, being one of these departments, may exercise any power properly belonging to either of the others, except as expressly directed or permitted by the constitution. Neither of these three departments is subordinate to or may exercise any control over another except as is provided by the constitution. Their status is that of equality, each acting within its own sphere independent of each of the others, *so long as*

*its action does not exceed the powers confided to it,* unless particular exceptions are made to this general rule by the constitution itself. The *legislative department determines what the law shall be,* the executive department executes or administers the law, and the judicial department construes and applies the law. *Neither one of these departments can arrogate to itself any control over either one of the other departments in matters which have been solely confided by the constitution to such other department.* The power to enact statutes is, clearly, solely a legislative power confided by the constitution to the legislature. The power to construe statutes is confided to the judiciary.'' (Emphasis added.) (*Fergus v. Marks* (1926), 321 Ill. 510, 513-14.)

In holding that home rule municipalities have no proprietary power over their streets and may not require AT&T to pay a franchise fee for its extraordinary use of their streets, the new majority has reached far beyond its judicial function and has usurped legislative authority to alter home rule powers, a role specifically reserved to our legislature by our constitution. Clearly, in arrogating to itself the legislature's constitutional authority to alter home rule powers, the new majority violates our State constitutional right to be governed by a system of government based upon the separation of powers. This denial of our State constitutional right is a clear violation of our fourteenth amendment due process rights and cannot be tolerated.

### Fourteenth Amendment Due Process

#### A

The new majority's violation of our constitution's separation of powers provision, in turn, violates the fourteenth amendment due process rights of all Illinois citizens. An issue concerning the separation of powers ''reaches the very foundation principles upon which our government is based. It is no less delicate than funda-

mentally important." (*People v. Bissell* (1857), 19 Ill. 229, 230.) The ultimate purpose of a system of government based on separated powers and the structural protections incorporated therein is *the protection of liberty and the security of the governed. (Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.* (1991), 501 U.S. 252, 272, 115 L. Ed. 2d 236, 256, 111 S. Ct. 2298, 2310; *Bowsher v. Synar* (1986), 478 U.S. 714, 730, 92 L. Ed. 2d 583, 599, 106 S. Ct. 3181, 3190.) Illinois citizens' right to be governed by a system of separated powers is a matter of liberty—a substantive due process right—granted to us by the fundamental law of our State constitution.

Furthermore, our State constitution's system of government is also a due process property right. As the Supreme Court has stated:

> "[Due process] [p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.)

Later, in limiting the reach of *Roth*, the Supreme Court further explained:

> "It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. ***

> In each of these cases [which recognized a due process violation], as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." (*Paul v. Davis* (1976), 424 U.S. 693, 710-11, 47 L. Ed. 2d 405, 419-20, 96 S. Ct. 1155, 1165.)

The interest of Illinois citizens in being governed by a government of separated powers is much "more than an abstract need or desire for it." (*Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.) So too, our interest is "more than a unilateral expectation of it." (*Roth*, 408 U.S. at 577, 33 L. Ed. 2d at 561, 92 S. Ct. at 2709.) Indeed, the right to be governed by a government of separated powers is a right granted to us *by our State constitution*. As such, it is a fundamental, vested right to which each citizen of Illinois has a "legitimate claim of entitlement" and which rises to fourteenth amendment constitutional dimension. (*Roth*, 408 U.S. at 577, 33 L. Ed. 2d at 561, 92 S. Ct. at 2709; *Medina v. Rudman* (1st Cir. 1976), 545 F.2d 244; see also *Springer v. Philippine Islands* (1928), 277 U.S. 189, 72 L. Ed. 845, 48 S. Ct. 122.) The new majority's violation of our State constitution's separation of powers provision constitutes a clear violation of our fourteenth amendment due process rights and cannot be tolerated.

## B

The new majority, by its opinion, is, in effect, levying a tax upon the citizens of the defendant municipalities. Pursuant to the majority's mandate, these municipalities must grant AT&T a valuable easement, an estate in land, *for free*. Generally, the grantor of an easement is

entitled to receive consideration in return for such a grant. This is true even in the instant case where AT&T has paid a substantial sum of money to the railroad for its grant of an easement to AT&T. The new majority's opinion, however, requires the municipalities to grant AT&T an easement and receive nothing in return. The new majority's opinion, in effect, deprives the municipalities of revenue they otherwise would have received. The new majority is forcing these municipalities to subsidize AT&T.

Since the municipalities hold their streets in trust for the benefit of their citizens, the forced subsidy, in effect, amounts to an exactment of a tax upon the local, individual inhabitants of the defendant municipalities who receive no benefit. The new majority's imposition of this tax is in the nature of a taking, without just compensation, for a private purpose and runs afoul of the fourteenth amendment rights of these citizens in numerous respects.

As this court has stated:

"It is a violation of the due process of law clause of the National and State constitutions to take a citizen's money from him under the guise of taxes for any other than a public purpose." *Chicago Motor Club v. Kinney* (1928), 329 Ill. 120, 130.

See *Spencer v. Merchant* (1888), 125 U.S. 345, 353, 31 L. Ed. 763, 767, 8 S. Ct. 921, 925.

The Supreme Court has stated:

"The due process of law clause contains no specific limitation upon the right of taxation in the states, but it has come to be settled that the authority of the states to tax does not include the right to impose taxes for merely private purposes. *** 'In the Fourteenth Amendment the provision regarding the taking of private property is omitted, and the prohibition against the state is confined to its depriving any person of life, liberty or property, without due process of law. It is claimed, however, that

the citizen is deprived of his property without due process of law, if it be taken by or under state authority for any other than a public use, either under the guise of taxation or by the assumption of the right of eminent domain.' " *Green v. Frazier* (1920), 253 U.S. 233, 238-39, 64 L. Ed. 2d 878, 881, 40 S. Ct. 499, 501, quoting *Fallbrook Irrigation District v. Bradley* (1896), 164 U.S. 112, 155, 158, 41 L. Ed. 369, 387, 388, 17 S. Ct. 56, 61, 63.

The result of the new majority's opinion is solely a private benefit to AT&T. The legislature has already granted telephone companies like AT&T the power of eminent domain to acquire easements from private property owners necessary to the construction of its cable. Along with this power, however, comes the corresponding duty to provide just compensation. The utility's statutory power of eminent domain, however, does not extend to municipal property. The municipalities neither solicited nor invited AT&T to use their streets. They were content to be left alone. However, it was AT&T which chose to go through the municipalities because it was more profitable for it and would give it an advantage over its competition.

Although it admits to paying a "substantial" fee to a railroad for an easement, AT&T refuses to pay any compensation to the municipalities for the extraordinary use of their streets. AT&T could have avoided going through the municipalities by exercising its power of eminent domain to obtain easements from private property owners beyond the municipal boundaries. However, AT&T would be required to pay "just compensation" for those easements. It would also be delayed because of the constitutional requirement of compliance with "due process" in any eminent domain proceedings against private property owners. The end result of the new majority's opinion is to save AT&T both money and time.

Clearly, saving a private, profit-motivated company money and time does not serve any public purpose. Therefore, the new majority's opinion exacts a tax from the municipal inhabitants in violation of their fourteenth amendment due process rights.

## II

### Conclusion

For the foregoing reasons, I respectfully dissent. Accordingly, I would reverse the decisions of the appellate and circuit courts.

## APPENDIX TO DISSENT

Docket No. 72315—Agenda 17—March 1992.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY *et al.*, Appellees, v. THE VILLAGE OF ARLINGTON HEIGHTS *et al.*, Appellants.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiffs, American Telephone & Telegraph Company and AT&T Communications of Illinois, Inc., brought an action in the circuit court of Cook County against the defendants, the Villages of Arlington Heights, Palatine, Barrington and Lake Barrington, and the City of Crystal Lake. The plaintiffs sought to enjoin the defendants from interfering with AT&T's installation of a fiber optic telecommunications cable under the defendants' streets. The trial court entered an interlocutory order enjoining the defendants from interfering with the installation of the cable. The appellate court affirmed in part and reversed in part. (*American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381.) Subsequently, the trial court converted the preliminary injunc-

tion into a permanent injunction. The appellate court affirmed. (216 Ill. App. 3d 474.) We allowed the defendant municipalities' petition for leave to appeal. 134 Ill. 2d R. 315(a).

Plaintiffs, American Telephone and Telegraph Company and AT&T Communications of Illinois, Inc. (hereafter collectively referred to as AT&T), planned to construct a fiber optic cable system from Glenview to Rockford, Illinois, a distance of approximately 85 miles. Fiber optic cables are bundles of hair-thin glass fibers through which laser light beams carry communications, computer and other data at high speed. The cables are located in underground conduits buried in trenches. The Glenview—Rockford cable carries exclusively long distance telecommunications traffic. The cable route cannot be used for local telephone service. AT&T installed most of the cable system on private property owned by Chicago and Northwestern Railroad, pursuant to an easement which AT&T purchased from the railroad company. Although the actual amount of compensation which AT&T paid for the easement is not part of the record on appeal, AT&T stipulated that the amount was "substantial." Where the railroad property intersects highways and crosses public streets, AT&T sought to route the cable under the public way.

In February 1987, an agent of AT&T began inquiries with municipalities through which the cable system would pass for the purpose of securing permits to install the cable under public streets. The five municipalities involved in this dispute (hereafter, defendant municipalities) informed AT&T that they would require a franchise agreement before issuing a permit. The defendant municipalities informed AT&T that the Northwest Municipal Conference (hereafter Conference), an organization of municipalities, would represent them in negotiations with AT&T over the

franchise agreements. Negotiations ensued between representatives of AT&T and representatives of the Conference. Initially, the Conference requested that AT&T enter into a franchise agreement similar to the agreement AT&T had entered into with the City of Chicago, which provides for annual payments of 2% of gross revenues derived from long distance calls originating in Chicago, or a minimum of $5 million annually. AT&T rejected that proposal.

The Conference next proposed a franchise agreement modeled after a franchise agreement adopted by Western Union. Under the "Western Union" model, AT&T would have paid each municipality a set sum ($2.50) for each foot of cable laid within the municipality's boundaries, plus an annual administrative fee. AT&T rejected this proposal and counteroffered to pay $1 a foot for cable installed under municipal streets and an annual administrative fee of $5,000. The municipalities rejected AT&T's proposal and negotiations continued. Representatives of the Conference offered several alternative methods of compensation based on the amount of cable present in each municipality, but no agreement was reached.

In June 1987, AT&T advised the defendant municipalities in writing that it concluded that negotiations with the Conference were at an impasse. AT&T then took the position that Illinois law does not require a franchise agreement as a condition precedent to the issuance of permits to install its fiber optic cable beneath the public ways. AT&T subsequently submitted formal permit applications to the defendant municipalities, which were denied.

The record demonstrates that the defendant municipalities had previously issued permits for undercrossings only to businesses that negotiated franchise agreements with them, such as Commonwealth Edison, Western Union, Illinois Bell, Northern Illinois Gas, and Centel Cable Televi-

sion. Although the negotiated terms of those agreements vary, *all* agreements required the applicant to compensate the municipality in some manner for the privilege of using the streets. The record also shows that AT&T has entered into numerous agreements with municipalities, including Chicago, Bloomington, Champaign, Springfield, Decatur, Peoria, and Morton, that require it to pay compensation for the use of public streets.

In August 1987, AT&T sent "10-day notices" to the defendant municipalities, purporting to invoke powers conferred under section 4 of the Telephone Company Act (Ill. Rev. Stat. 1987, ch. 134, par. 20). The notices stated that AT&T intended to begin construction of its fiber optic cable network under various streets of the defendant municipalities and informed them that they had 10 days to provide time, place and manner specifications regarding the work. The municipalities did not respond. After 10 days, AT&T commenced work in two of the defendant municipalities without a franchise agreement or the required permits. The defendant municipalities issued stop work orders.

AT&T then filed a complaint in the circuit court of Cook County seeking a preliminary injunction barring the defendants from interfering with the installation of the fiber optic cable under their public streets. AT&T also sought a declaratory judgment stating that the defendant municipalities could not require them to obtain permits or to enter into franchise agreements. The complaint also contained a prayer for an order of *mandamus* requiring the defendant municipalities to allow AT&T to construct its cable system under the defendants' street crossing. The defendant municipalities argued that AT&T had no right to undercross their streets and that they had an absolute

right to prohibit AT&T from using the public streets to install its cable except on such terms as they might demand.

On November 2, 1987, the trial court, following an evidentiary hearing, entered an interlocutory order enjoining the defendant municipalities from interfering with AT&T's installation of the cable under public streets within the municipalities. The trial court found that AT&T would suffer irreparable harm unless an injunction were entered, because AT&T might lose its competitive edge over other long distance carriers if it did not meet the deadline it had established for installation of the cable system. The trial court also ordered the parties to choose a team of arbitrators to determine what "fair compensation" should be paid to the municipalities for the use of their streets. The defendants appealed from the interlocutory order. The appellate court affirmed the preliminary injunction, but reversed the trial court's arbitration order, finding that the question of fair compensation was a legislative determination properly resolved by the municipalities themselves. *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381.

On May 2, 1989, AT&T filed a motion to convert the preliminary injunction to a permanent injunction. The trial court issued an injunction which permanently enjoined the defendant municipalities from interfering with or disrupting the ongoing operation of plaintiff's fiber optic telecommunications system. The trial court ruled that the plaintiffs had the right to construct their fiber optic cable beneath the streets of the defendant municipalities pursuant to the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111$\frac{2}{3}$, par. 13—202) and pursuant to the Telephone Company Act (Ill. Rev. Stat. 1987, ch. 134, par. 4). The defendant municipalities appealed. The appellate court, with one justice dissenting, affirmed the trial court, holding that

municipalities may exercise only regulatory authority over public streets and are limited to charging regulatory fees for the use of such streets. This court allowed the defendant municipalities' petition for leave to appeal. (134 Ill. 2d 315(a).) We also allowed the motion of the city of Chicago for leave to intervene as appellants.

The question presented in this appeal is whether the defendant municipalities may require a franchise agreement as a precondition to AT&T's use of public streets for private gain. To answer this question, we must consider two separate issues: (1) whether the defendant municipalities may prohibit AT&T's use of the streets pending negotiation of a franchise agreement; and (2) whether the defendant municipalities may require AT&T to pay a franchise fee, in the nature of rent, for the privilege of using the public streets. We conclude that the relevant case law and statutory provisions clearly demonstrate that the defendant municipalities do have the authority to prohibit AT&T's use of public streets pending negotiation of a franchise agreement, and to require AT&T to pay a franchise fee, in the nature of rent, for the privilege of using the streets in the manner AT&T desires.

## Prefatory Note

We emphasize that we do *not* consider whether the amount of compensation, rent or franchise fees proposed by the defendant municipalities was reasonable or excessive. That question is not presented here because AT&T claims that the defendant municipalities are not entitled to *any* compensation, other than regulatory costs, for the privilege of using their streets. AT&T's complaint did not contend, in the alternative, that if franchise fees are permissible, the amount of compensation which the defendant municipalities proposed was excessive or unreasonable.

Rather, AT&T claims that the defendant municipalities may not charge AT&T rent for its use of the streets. AT&T argues that any fee imposed by the defendant municipalities must be based upon and collected for the purpose of defraying the expenses the municipalities incur as a direct result of AT&T's installation of its cable (hereafter, regulatory costs or regulatory fees).

## ANALYSIS

Municipal corporations possess a double character—one governmental, regulatory or public, and the other proprietary or private. (1 E. McQuillin, Municipal Corporations §2.09 (3d ed. 1987).) The defendant municipalities here argue that they have both regulatory and proprietary powers over the streets. They argue that they may, pursuant to their proprietary power over streets within their control, impose franchise fees, in the nature of rent, upon those who seek to use such streets for purposes other than ordinary travel. AT&T, on the other hand, argues that municipalities have only regulatory authority (or police powers) over public streets and have no right to prohibit AT&T from using public streets to install its fiber optic cable system. AT&T claims that a municipality's authority is limited to enacting regulations relating to the use of public streets and to charging reasonable *regulatory* fees for such use. This court's previous decisions and applicable State statutes, however, directly repudiate AT&T's argument. See, *e.g.*, *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324.

In Illinois, fee simple title to the streets is vested in municipal corporations. (10A E. McQuillin, Municipal Cor-

porations §§30.35 through 30.36 (3d rev. ed. 1990); *Wilmot v. City of Chicago* (1927), 328 Ill. 552; *Sherwin v. City of Aurora* (1913), 257 Ill. 458; *City of Chester v. Wabash, Chester & Western R.R. Co.* (1899), 182 Ill. 382.) It is well established that municipalities hold title to streets in trust for the benefit of use by the public, and on principle, such trust property can be disposed of by the municipality only in accordance with the public interest. (10A E. McQuillin, Municipal Corporations §28.38 (3d rev. ed. 1990); 2 Dillon on Municipal Corporations §§544, 551.) Because municipalities hold title to the streets for the benefit of the public, this court has recognized that all citizens are vested with the right to use public streets for travel from one place to another in the ordinary course of business or pleasure. (*Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 206-07.) No person or company, however, has an unfettered right to make a greater use of public streets for his or its own private gain. (*Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 206-07.) Here, AT&T seeks the privilege of using public streets in an extraordinary manner. AT&T does not want to use the streets as a means of travel. Rather, AT&T wants to tear up the streets and permanently install its cable underneath them, with the obvious goal of increasing its market share of long distance telephone service.

A special right or privilege conferred upon a private corporation to use public streets in an extraordinary manner is commonly referred to as a "franchise." (12 E. McQuillin, Municipal Corporations §34.01 (3d rev. ed. 1990); see also *Chicago Municipal Gas Light & Fuel Co. v. Town of Lake* (1889), 130 Ill. 42, 54.) The power to grant or refuse franchises to use the streets resides primarily in the legislature, which possesses full and paramount power over highways, streets and alleys located in the State. The

legislature's authority to grant or refuse franchises for the use of the streets may be delegated to municipalities, either by constitutional provision or by statute. (12 E. McQuillin, Municipal Corporations §34.10a, at 42; §34.13, at 49-50 (3d rev. ed. 1990); see also *Chicago Motor Coach*, 337 Ill. at 207.) The parties here dispute whether the legislature's authority to grant or refuse franchises has been conferred upon the defendant municipalities.

To resolve this dispute properly, it is necessary to distinguish between those defendant municipalities that are home rule units and those that are not home rule units. This distinction is important because the powers of non-home-rule municipalities are different from, and may be more limited than, those of home rule units. Cities and villages that are not home rule units may exercise only those powers that the legislature confers upon them, either expressly or impliedly, by statute. (*Pesticide Public Policy Foundation v. Village of Wauconda* (1987), 117 Ill. 2d 107.) Consequently, as to the three defendant municipalities that are *not* home rule units (Barrington, Lake Barrington and Crystal Lake), the question is whether they exceeded their *statutory* authority when they prohibited AT&T from installing its cable under their streets pending negotiation of a franchise agreement.

Two of the municipalities involved in this dispute (Arlington Heights and Palatine) and the intervening municipality (Chicago), however, are home rule units. Home rule units derive their power from the constitution, rather than from statutes. Consequently, as to the three municipalities that are home rule units, the question is whether they exceeded their *constitutional* authority when they prohibited AT&T's use of their streets pending negotiation of a franchise agreement. We will address the powers of

the non-home-rule units and the home rule units separately.

## 1. Non-Home-Rule Municipalities

We first consider the *statutory* powers of the non-home-rule municipalities (hereafter, municipalities). As stated, discussion of these powers involves two separate inquiries: (1) whether the defendant municipalities have the power to prohibit a company such as AT&T from using municipal property for private gain without a franchise agreement; and (2) whether municipalities have the authority to require AT&T to pay a franchise fee, in the nature of rent, for the privilege of using public streets in an extraordinary manner for private profit.

This court has consistently recognized that municipalities have statutory authority to prohibit a public utility from using public streets without a franchise agreement. *People ex rel. Jackson v. Suburban R.R. Co.* (1899), 178 Ill. 594, 607 ("[i]n the absence of the ordinance the respondent company had no power or right to enter upon the streets of the village and erect poles, string wires thereon and construct and operate its road by electricity upon and along such streets"); *Olsen v. City of Chicago* (1962), 25 Ill. 2d 292, 294 ("[t]he power of a municipality to regulate or prohibit the use of its streets for private gain is established"); *Coles-Moultrie Electric Cooperative v. Illinois Commerce Comm'n* (1985), 131 Ill. App. 3d 946 (municipalities have discretion to grant or withhold franchises to utility, and this power derives from the right of municipalities to control and regulate their streets); see *Blair v. City of Chicago* (1906), 201 U.S. 400, 50 L. Ed. 801, 26 S. Ct. 427 (the consent of a municipality is required for the use of the public ways by a street railroad).

APPENDIX TO DISSENT

In *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, this court specifically held that municipalities have *statutory* authority to prohibit public utilities from using the streets without a franchise agreement. In *Geneseo*, two municipalities ordered utilities to remove their property from the public ways, upon the expiration of franchise agreements, so that municipally owned utilities could replace the private utilities. (*Geneseo*, 378 Ill. at 510.) The utilities, like AT&T here, claimed that the municipalities had the right to *regulate* the use of the streets, but had no right to prohibit a utility from using public streets in an extraordinary manner where the utility had a certificate of public convenience and necessity from the Illinois Commerce Commission.

As support for this claim, the utilities relied primarily upon *Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, where the court invalidated a municipal ordinance that required bus companies to enter into a franchise agreement with the city before using the public streets. The court in *Chicago Motor Coach* held that the City of Chicago had no statutory authority to *prohibit* a private company from using the streets in an extraordinary manner without a franchise agreement. The court held that, while the city had statutory authority to *regulate* a private corporation's use of the streets, it had no statutory authority to prohibit or exclude it from using the streets altogether. The court concluded that "[r]egulation is inconsistent with prohibition or exclusion." *Chicago Motor Coach*, 337 Ill. at 206.

In *Geneseo*, this court repudiated *Chicago Motor Coach* and held that municipalities have statutory authority to prohibit public and private companies from using public streets for extraordinary purposes without a franchise agreement. The court in *Geneseo* specifically discussed the

statutory bases for this power. The court noted that the cities and villages act (Ill. Rev. Stat. 1939, ch. 24, par. 383) gave municipalities significant control over streets. The court enumerated a number of specific powers relating to the use of public streets which that statute granted to municipalities. These statutory powers included, *inter alia*: the power to control municipal property; the power to regulate use of the streets; the power to prevent and remove encroachments from streets; the power to construct tunnels, sewers, bridges and viaducts on and under streets; the power to prevent the use of streets for signs, posts, poles and advertisement; and the power to pass all ordinances proper or necessary to carry into effect the powers granted by statute. (*Geneseo*, 378 Ill. at 519-20.) The court found that these statutory powers authorized municipalities to regulate and control the use of their streets, and that these powers "included the right to grant to or to withhold that use from utilities." *Geneseo*, 378 Ill. at 520.

The court in *Geneseo* also held that a municipality's power to prohibit a company from occupying the public way cannot be overridden by a certificate of public convenience and necessity from a utility regulatory commission such as the Illinois Commerce Commission. The court held that a certificate of public convenience and necessity does not give a utility the right to occupy the streets without a franchise agreement or contrary to the terms of a franchise agreement. The court determined that "the power vested in cities to permit or refuse a license or franchise to a public utility has not been repealed by the provisions of the Public Utilities act, and anything said to the contrary in *** *Chicago Motor Coach Co. v. City of Chicago, Supra,* is not adhered to." *Geneseo*, 378 Ill. at 530.

Thus, this court in *Geneseo* recognized that municipalities have statutory authority to prohibit a public utility,

such as AT&T, from using municipal property for private gain without a franchise agreement. The court also held that a certificate of public convenience and necessity is not sufficient to override a municipality's power to prohibit that utility's access to public streets. The statutes relied upon in *Geneseo* remain in effect today. (Ill. Rev. Stat. 1987, ch. 24, par. 11—80—2 *et seq.*) Consequently, under *Geneseo*, the defendant municipalities have statutory authority to prohibit AT&T from using public streets to install its cable without a franchise agreement.

In addition to prohibiting the use of public streets for private gain, municipalities also have statutory authority to permit any use of the streets that is not incompatible to the ends for which streets are established. (*Sears v. City of Chicago* (1910), 247 Ill. 204; see also *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *City of Springfield . v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *Chicago Municipal Gas Light & Fuel Co. v. Town of Lake* (1889), 130 Ill. 42; *City of Quincy v. Bull* (1883), 106 Ill. 337.) Our courts have held that municipalities have the authority to enter into franchise agreements which permit public utilities and private companies to use the public ways for purposes other than ordinary travel. (*Chicago Municipal Gas Light & Fuel Co. v. Town of Lake* (1889), 130 Ill. 42.) Our decisions also establish that a municipality, in granting a franchise to use public streets, may impose conditions to be performed before or after the rights under the franchise are claimed. (*City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253.) In *City of Springfield*, this court specifically acknowledged:

"A city is not required to grant privileges to all public service corporations on the same terms. *The power of permitting the use of the streets is discretionary* and is not required to be exercised by a general ordinance applicable alike to all cases, but each case may be acted upon with reference to its own conditions and circumstances. The city council may, in its discretion, grant a license for the occupation of the streets without qualification, or *may impose such conditions upon the giving of its consent to any particular company as it deems advisable.* [Citation.]" (Emphasis added.) *City of Springfield*, 279 Ill. at 327.

More specific to this case, our decisions have recognized that, where the enjoyment of a franchise depends upon the consent of a municipality, its right to impose conditions authorizes it to exact payment of a fee, as compensation for the privilege of using public streets in an extraordinary manner. *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253; *Lobdell v. City of Chicago* (1907), 227 Ill. 218; see also *Broeckl v. Chicago Park District* (1989), 131 Ill. 2d 79; *MacNeil v. Chicago Park District* (1948), 401 Ill. 556, 565.

AT&T argues, however, that municipalities are limited to charging regulatory fees for the privilege of using public streets. As support for this claim, AT&T argues that municipalities have only regulatory, and not proprietary, powers over public streets. However, decisions of this court have specifically stated that the right to demand a franchise fee is an exercise of the municipality's *proprietary* power over public property. (*City of Springfield*, 279 Ill. at 327; *Chicago General Ry.*, 176 Ill. at 257; see also *Broeckl*, 131 Ill. 2d at 86-87.) The court has repeatedly rejected the contention that the power to grant a franchise is a regulatory or police power. (*City of Springfield*, 279

Ill. at 327; *Chicago General Ry.*, 176 Ill. at 257; see also *Broeckl*, 131 Ill. 2d at 86-87.) It has also consistently rejected the claim that municipalities are limited to enacting regulatory measures and collecting regulatory fees. *City of Springfield*, 279 Ill. at 327; *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275; *MacNeil v. Chicago Park District* (1948), 401 Ill. 556, 565; *Chicago General Ry.*, 176 Ill. at 257; see also *Broeckl*, 131 Ill. 2d at 86-87.

For example, in *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253, the city enacted an ordinance granting the defendant railway the right to lay its tracks upon the streets subject to the condition that the defendant pay the city an annual fee of $500 per mile of track. The defendant claimed that the ordinance was invalid. It claimed that the city's power to consent to the railway's use of the streets was a mere police power and, consequently, the city had no power to exact a monetary sum beyond a small regulatory fee. This court expressly rejected the contention, stating that " 'the power here conferred is not a police power.' " (*Chicago General Ry.*, 176 Ill. at 257, quoting *City of Providence v. Union R.R. Co.* (1879), 12 R.I. 473.) The court concluded that a municipality has a right to exact a monetary consideration for its consent to the occupancy of the streets. The court explained that " '[t]he right to exact compensation in money, otherwise called a *bonus*, is justified on the ground that the right to use a street already graded, as a road-bed, is a valuable privilege \*\*\*. Where the enjoyment of the franchise depends upon the consent of the local authorities, their right to impose conditions authorizes them to exact the payment of a *bonus*.' " (Emphasis in original.) *Chicago General Ry.*, 176 Ill. at 257, quoting H. Booth, Street Railways §284, at 382-83 (1892).

Similarly, in *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324, this court upheld an ordinance which required corporations to pay $1 annually for any pole used to support wires, signs, awnings or advertising displays as compensation to the city for the use of its streets. (See also *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346.) The court explained:

> "*The ordinance was not a police ordinance.* It was not passed for the enforcement of local governmental supervision, but only to establish a charge in the nature of rental for the exclusive use of parts of the streets. The fixing of a charge in the nature of rental for the occupation by a public service corporation of parts of the streets of a city is not the exercise of any governmental power *but is the exercise of the proprietary power of the city.*" (Emphasis added.) *City of Springfield,* 279 Ill. at 327.

This court adopted and applied the reasoning employed in *City of Springfield* only three years ago in *Broeckl v. Chicago Park District* (1989), 131 Ill. 2d 79, 86. The plaintiffs in *Broeckl,* boat owners, challenged the park district's practice of charging mooring fees in excess of costs actually incurred. The plaintiffs in *Broeckl,* like the plaintiffs in this case, argued that the park districts held the harbors in trust for the benefit of the public and that the mooring fees charged must be based upon the actual cost of regulating the services provided. The court rejected this claim, finding that the park district was not exercising a police power function when it imposed the mooring fee. Rather, the park district, *pursuant to its proprietary powers over public property,* was renting the mooring facilities and could charge reasonable fees for the use of the facilities. This court concluded that the amount of the fees charged was a matter within the park commissioners' discretion.

*Broeckl*, 131 Ill. 2d at 86-87 (citing *City of Springfield*, 279 Ill. 324, and *MacNeil v. Chicago Park District* (1948), 401 Ill. 556).

Thus, our decisions have conclusively established the two propositions necessary to decide this case. First, municipalities have statutory authority to prohibit a company, such as AT&T, from using public streets for extraordinary purposes without a franchise agreement. This right was indisputably recognized in *Geneseo*, 378 Ill. at 520 (a municipality has the power to permit or refuse the occupancy of its streets by franchise or license). This rule is specifically embodied in our statutes. (See, *e.g.*, Ill. Rev. Stat. 1987, ch. 24, par. 11—80—2 *et seq.*) Second, this court, in a long line of decisions, has recognized that municipalities, pursuant to their *proprietary* powers over public property, may require payment of compensation in the nature of rental fees, for the privilege of using public streets. *City of Springfield*, 279 Ill. at 327; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275; *MacNeil v. Chicago Park District* (1948), 401 Ill. 556, 565; *Chicago General Ry.*, 176 Ill. at 257; see also *Broeckl*, 131 Ill. 2d at 86-87.

AT&T nevertheless claims that a franchise agreement is not a necessary prerequisite to its use of the defendant municipalities' streets. AT&T claims that *Geneseo* is not binding precedent in this dispute because "*Geneseo* did not involve a telephone company or the Telephone Company Act (Ill. Rev. Stat. 1987, ch. 134, par. 20)." These attempted "distinctions" lack any substance whatsoever. *Geneseo* reaffirmed a long line of Illinois decisions holding that a municipality has statutory power to prohibit a *public utility*, like AT&T, from utilizing a public street for purposes other than ordinary travel, without a franchise

agreement. AT&T is a public utility within the meaning of *Geneseo*. (See, *e.g.*, Ill. Rev. Stat. 1987, ch. 95½, par. 15—100.) Consequently, the instant case is controlled by *Geneseo* and its progeny.

AT&T also claims that *Geneseo* is not controlling here because it did not involve the Telephone Company Act. AT&T argues that the Telephone Company Act prohibits municipalities from requiring a franchise agreement as a precondition to AT&T's use of the streets to install its cable. On the contrary, section 4 of the Telegraph Act (Ill. Rev. Stat. 1987, ch. 134, par. 4) implicitly authorizes municipalities to require a franchise agreement, because this section of the Act requires a telephone company to obtain municipal consent prior to constructing its equipment along or under municipal streets. Section 4 states, in relevant part:

> "No such company shall have the right to erect any poles, posts, piers, abutments, wires or other fixtures of their lines along or upon any public ground *** within any incorporated city, town or village, *without the consent of the corporate authorities of such city, town or village.* The consent herein required must be in writing, and shall be recorded in the recorder's office of the county." (Ill. Rev. Stat. 1987, ch. 134, par. 4.)

Thus, section 4 of the Telegraph Act requires a telephone company to seek municipal consent prior to constructing its equipment under municipal streets. The plain language of that section repudiates AT&T's claim that the Telephone Company Act prohibits municipalities from requiring telephone companies to enter into franchise agreements as a precondition to their use of the streets. Further, as previously stated, our decisions have held that, where the enjoyment of a franchise depends upon the consent of a municipality, the right to impose conditions authorizes it to exact

payment of a fee, as compensation for the privilege of using public streets in an extraordinary manner. *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253.

AT&T next claims that section 4 of the Telephone Company Act grants it the authority to lay its cable under streets within the defendant municipalities without first obtaining the municipalities' consent. We disagree. Section 4 grants telephone companies the power to acquire *private property* through eminent domain, upon payment of proper compensation. That section also authorizes telephone companies to construct poles, wires or cables upon and across *highways*, provided that the telephone company gives to "the highway commissioners having jurisdiction and control over the road \*\*\* over which such line is proposed to be constructed" written notice of the company's intent to construct such line over or along the highway. The statute provides that the highway commissioners may, within 10 days after receiving such notice, specify the portion of the highway on which the line shall be placed.

AT&T claims that this portion of the Telephone Company Act grants it the authority to install its cable under the streets of the defendant municipalities without a franchise agreement. As stated, AT&T sent so-called "10-day notices" to the defendant municipalities involved here, in an attempt to invoke powers purportedly conferred in section 4. AT&T notified the defendant municipalities of its intent to install its cable and gave them 10 days within which to designate when, where and how the cable could be installed.

Nothing in section 4 of the Telephone Company Act, however, authorizes AT&T to install its cable under streets

in the defendant municipalities without the consent of those municipalities. A plain reading of that section reveals that the 10-day notice provision applies only to highways outside of incorporated areas and under the control of highway commissioners. That section specifically provides that nothing in the act shall interfere with the control now vested in cities, incorporated towns and villages. (Ill. Rev. Stat. 1987, ch. 134, par. 20.) As previously noted, the "control now vested in" municipalities includes the authority to prohibit AT&T's use of the streets pending negotiation of a franchise agreement. *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506.

AT&T claims that, even if the Telephone Company Act requires it to obtain the consent of the defendant municipalities, the municipalities had no right to condition their consent upon the negotiation of a franchise agreement. AT&T claims that a municipality is limited to providing time, place and manner restrictions within 10 days of receiving notice from the telephone company of its intent to install its equipment on municipal property. As stated, however, the "10-day notice" provision applies only to highways under the jurisdiction of highway commissioners. It does not permit a telephone company to install its equipment in the street of any incorporated city or village, such as the defendant municipalities, without the consent of such municipalities.

Shortly after the Telephone Company Act was enacted, this court specifically held that the 10-day notice provision did not apply to incorporated cities. (*People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275.) This court also rejected the contention, now advanced by AT&T, that section 4 limits a city's control to prescribing time, place and manner restrictions upon telephone companies that seek to install their equipment on

the public streets. In *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275-76, this court stated:

> "*[The Telephone Company Act] *** gives no authority to a telephone corporation to set poles or string wires in the street of any incorporated city, town or village without the consent of the corporate authorities.* *** The act *** expressly provides that *nothing contained in it shall interfere with the control vested in cities,* incorporated towns and villages in relation to the regulation of the poles, wires, cables and other appliances. *That control is not limited to prescribing the location and size of poles, and such matters, but extends to the whole subject.* There is no provision for giving notice to a city of the intention to construct a line, with the privilege to the city of specifying the portion of the street on which the line shall be placed, as there is in the case of highway commissioners. *The whole matter of control by municipalities remains where it was before the act was passed.*" (Emphasis added.)

Thus, it is well established that nothing in the Telephone Company Act interferes with a municipality's authority and control over the use of its streets. Moreover, in cases decided both before and after the Telephone Company Act was enacted, this court has held that a municipality's authority is *not limited to reasonable regulation of the method of using the streets.* (*City of Springfield,* 279 Ill. at 327; *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 275; *MacNeil v. Chicago Park District* (1948), 401 Ill. 556, 565; *Chicago General Ry.,* 176 Ill. at 257; see also *Broeckl,* 131 Ill. 2d at 86-87; 12 E. McQuillin, Municipal Corporations §§34.10a through 34.13; §34.19, at 76 n.4 (3d rev. ed. 1986), citing *Blair v. City of Chicago* (1906), 201 U.S. 400, 50 L. Ed. 801, 26 S. Ct. 427.) Rather, a municipality, pursuant to its proprietary power over the streets, may require a franchise fee which exacts a rental fee for the privilege of using the streets in an extraordi-

nary manner. (*City of Springfield*, 279 Ill. at 327; *Chicago General Ry.*, 176 Ill. at 257.) Thus, contrary to AT&T's argument, nothing in the Telephone Company Act interferes with a municipality's power to condition its consent upon a franchise agreement which requres payment of a fee, in the nature of rent, for the privilege of using the streets in an extraordinary manner.

AT&T also cites this court's decision in *Village of Lombard v. Illinois Bell Telephone Co.* (1950), 405 Ill. 209, as authority for its claim that it need not pay a franchise fee for the privilege of using streets within the defendant municipalities. AT&T contends that *Village of Lombard* stands for the proposition that a municipality may not demand compensation for a utility's use of public streets. *Village of Lombard* does not control here.

*Village of Lombard* considered the validity of an ordinance which required corporations maintaining pipes, conduits, cables, poles or wires in or under any public place to pay the village 3% of the gross receipts from services rendered within the village, for the privilege of using public property. The court in *Village of Lombard* first concluded that the ordinance was an invalid attempt to impose an *occupational tax* upon a public utility's gross receipts. The court found that the municipality lacked specific statutory authority to impose such an occupational tax. (*Village of Lombard*, 405 Ill. at 213-16.) This portion of *Village of Lombard* is not relevant to this dispute because the municipalities involved here do not seek to impose a tax upon AT&T. Rather, they seek reasonable compensation, in the nature of a rental fee, for the privilege of using public streets for an extraordinary purpose and private profit. Thus, to the extent *Village of Lombard* precluded a municipality from charging an occupational tax, the decision has no bearing on the instant case.

APPENDIX TO DISSENT

After addressing the taxation question, however, the court in *Village of Lombard* went on to hold that the municipality involved lacked statutory authority to charge public utilities rent for the privilege of using public property. (*Village of Lombard,* 405 Ill. at 216.) The court in *Lombard* cited no authority for this conclusion. Instead, the *Lombard* court completely ignored or made unpersuasive attempts to distinguish prior decisions of this court which had reached precisely the opposite conclusion. (*Village of Lombard,* 405 Ill. at 218.) AT&T mistakenly relies upon this second part of *Village of Lombard* as authority for the proposition that the municipalities involved in this dispute likewise lack statutory authority to exact compensation from AT&T for the privilege of using public streets.

AT&T fails to recognize, however, that shortly after *Village of Lombard* was decided, the legislature repudiated that decision's holding that municipalities lack statutory authority to charge compensation for the privilege of using public streets. (Ill. Rev. Stat. 1955, ch. 24, par. 23—113.) In 1955, the legislature enacted Senate Bill 750, which amended the Revised Cities and Villages Act. (Ill. Rev. Stat. 1955, ch. 24, par. 23—113.) This amendment, *inter alia,* gave municipalities the power to impose an occupational tax upon "[p]ersons engaged in the business of transmitting messages by means of electricity, at a rate not to exceed 5% of the gross receipts from such business originating within the corporate limits of the municipality." (Ill. Rev. Stat. 1955, ch. 24, par. 23—113(1).) More significant to this case, this amendment expressly stated:

> "*Any of the taxes enumerated in this Section may be in addition to the payment of money,* or value of products or services furnished *to the municipality by the [public utility] as compensation for the use of its streets,* alleys, or other public places, or installation and maintenance therein, thereon or

thereunder of poles, wires, pipes or other equipment used in the operation of the [public utility's] business." (Emphasis added.) (Ill. Rev. Stat. 1955, ch. 24, par. 23—113.)

This statute, which remains in effect today, clearly repudiated any prior law, be it statutory or judicial, which denied municipalities the right to demand compensation for the use of its streets. Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2.

The legislative action taken in the 1955 amendment was unnecessary prior to *Village of Lombard*, because this court, prior to that decision, had accurately construed the legislature's intent. This court's decisions have consistently held that municipalities have implied statutory authority to exact compensation, in the nature of rent, for the privilege of using public streets for private gain. (See *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324; *City of Springfield v. Postal Telegraph-Cable Co.* (1912), 253 Ill. 346; *Chicago General Ry. Co. v. City of Chicago* (1898), 176 Ill. 253; see also *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506.) The court in *Village of Lombard* thwarted the legislature's intent, by making an unwarranted departure from these decisions. Following that erroneous decision, the legislature repudiated the *Village of Lombard* holding and expressly stated that municipalities *do* have the power to collect compensation for the use of public streets.

The legislature has expressly stated that municipalities have the authority to require public utilities, such as AT&T, to pay compensation for the privilege of using public streets. (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2.) AT&T rests its entire argument to the contrary upon *Village of Lombard*'s holding that municipalities lack such statutory authority. It is clear, however, that *Village of Lombard* is no longer viable today. In sum, relevant case

law and statutory provisions establish that the defendant municipalities have the statutory authority to prohibit AT&T's use of the streets pending negotiation of a franchise agreement and to require AT&T to pay a franchise fee, in the nature of rent, for the privilege of using public streets in an extraordinary manner for private profit.

## 2. Home Rule Municipalities

We next consider whether the municipalities involved in this dispute that are *home rule units* (Arlington Heights, Palatine and the City of Chicago, as intervenor) have the power to prohibit AT&T from using public streets within their control pending negotiation of a franchise agreement, and to require AT&T to pay compensation for the privilege of installing its fiber optic cable under their streets.

We initially note that home rule units did not exist in this State until after the ratification of the 1970 Illinois Constitution. As a result, all of the cases that specifically discuss a municipality's power to prohibit use of its streets and its power to charge franchise fees, in the nature of rent, for the privilege of using public streets for private gain, involved the *statutory* power of municipalities that were *not* home rule units.

Home rule units, however, derive their power from the *constitution*, rather than from statutes. Our constitution provides that a home rule unit *"may exercise any power and perform any function pertaining to government and affairs."* (Emphasis added.) (Ill. Const. 1970, art. VII, §6(a).) This language was designed to establish the broadest possible description of the powers that home rule units can exercise. (Ill. Ann. Stat., 1970 Const., art. VII, §6(a), Constitutional Commentary, at 24 (Smith-Hurd 1971).) The constitution also specifies that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, §6(m).

The drafters of the constitution intended to grant home rule units greater power and autonomy than was previously enjoyed by non-home-rule units. Non-home-rule units may exercise only those powers that the State legislature confers upon them, either expressly or impliedly, by statute. (*Pesticide Public Policy Foundation v. Village of Wauconda* (1987), 117 Ill. 2d 107.) Home rule units, on the other hand, may exercise any power and perform any function concurrently with the State, unless the General Assembly specifically limits the concurrent exercise of such power or specifically declares that the State's exercise is exclusive. (Ill. Const. 1970, art. VII, §6(i).) The General Assembly has not limited the power of home rule units to require public utilities to enter franchise agreements which exact rent for the privilege of using public property in an extraordinary manner.

Consequently, the power which the home rule units seek to exercise here is valid, if that power pertains to those municipalities' "government and affairs." A municipality's power to require a public utility to enter a franchise agreement which exacts fees, in the nature of rent, for the privilege of using public property wholly within the municipality's control for private gain is certainly a matter "pertaining to its government and affairs." See Ill. Ann. Stat., 1970 Const., art. VII, §6, Constitutional Commentary, at 24 (Smith-Hurd 1971).

AT&T argues, however, that home rule units lack authority to require a franchise agreement and franchise fees because AT&T's installation of the fiber optic cable is a matter of statewide, rather than local, concern. This court has previously stated, however, that "[w]hether a particular problem is of statewide rather than local dimension must be decided *** with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and

statewide authorities in dealing with it." (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 501.) A municipality undoubtedly has a greater interest than the State in determining the conditions under which public property located entirely within the municipality's boundaries may be used in an extraordinary manner for private gain. Further, as previously noted, this court has recognized that the right to exercise control over the use of streets, including the right to grant or to withhold that use from utilities, is a matter of local rather than statewide concern. (See *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506.) Finally, the fact that the legislature has expressly delegated to non-home-rule municipalities the power to grant franchises and to exact compensation for the privilege of using public streets reflects its understanding that such matters are of local and not State concern.

AT&T suggests, however, that in matters as important as long distance telephone service, recognition of an unqualified right to use municipal streets is preferable to permitting individual control by local units of government. This court, however, has recognized:

> "Home rule *** is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem." (*Kalodimos*, 103 Ill. 2d at 502.)

We conclude that home rule municipalities have inherent constitutional authority to require AT&T to enter a negotiated franchise agreement, which exacts fees, in the nature of rent, as a precondition to AT&T's extraordinary use of streets wholly within the control of those municipalities.

As further support for this conclusion, we note that our courts have upheld similar acts as valid exercises of home rule powers. See, *e.g., Crain Enterprises, Inc. v. City of Mound City* (1989), 189 Ill. App. 3d 130 (city ordinances granting a business a railroad franchise and vacating public streets for the economic benefit of the city and its citizens constituted legitimate exercises of city's home rule powers, where streets were wholly within city borders and did not form link in State highway); *Krughoff v. City of Naperville* (1976), 41 Ill. App. 3d 334, *aff'd on other grounds* (1977), 68 Ill. 2d 352 (ordinance requiring contribution of land, or money in lieu of land, for school and park sites as a condition to approval of a subdivision plat is a valid exercise of home rule powers); see also *Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 501 (ordinance banning possession of operable handguns pertained to the municipalities' "government and affairs"); *City of Evanston v. Create, Inc.* (1980), 84 Ill. App. 3d 752, *aff'd* (1981), 85 Ill. 2d 101 (residential landlord and tenant ordinance is a valid exercise of city's home rule powers); *City of Chicago v. Pioneer Towing, Inc.* (1979), 73 Ill. App. 3d 867 (ordinance requiring towing companies to bear the cost of posting signs indicating that unauthorized cars would be towed from premises which company serviced is a valid exercise of home rule powers).

## Conclusion

In sum, we conclude that all of the municipalities involved in this dispute have the right to require a franchise agreement, which exacts fees, in the nature of rent, as a precondition to AT&T's use of public streets for private gain. The non-home-rule municipalities have *statutory* authority to prohibit AT&T's use of public streets and to condition their consent to such use upon a franchise agreement which exacts compensation for the privilege of using public streets in an

extraordinary manner for private profit. Likewise, the home rule units involved in this dispute have inherent *constitutional* authority to precondition their consent to AT&T's use of public streets, upon a negotiated franchise agreement which exacts rental fees for the privilege of using public property within those municipalities' control in an extraordinary manner.

The dissent ignores the well-established constitutional, legislative and judicial precedents which support the powers of units of local government. It cites a recent opinion of the Seventh Circuit Court of Appeals which refers to Illinois municipalities as "so many little medieval German principalities" (*Diginet Western Union ATS v. City of Chicago* (7th Cir. 1992), 958 F.2d 1388, 1400), but omits the fact that the same opinion is qualified by the admission that "State courts are not bound by federal courts' interpretations of State law." (*Diginet*, 958 F.2d at 1395.) The dissent wants to reinstate the decision in *Village of Lombard*, despite the fact that the legislature repudiated that decision shortly after it was announced. We are bound to follow the law in its present form, not as it was erroneously interpreted in 1950. The law unequivocally establishes that all of the municipalities involved in this dispute have the right to require a franchise agreement, which exacts fees, in the nature of rent, as a precondition to AT&T's use of public streets for private gain.

Accordingly, the decisions of the appellate and the circuit courts are reversed.

*Appellate court reversed;*
*circuit court reversed.*